**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: scott@bursor.com
          ltfisher@bursor.com
          apersinger@bursor.com
          ykrivoshey@bursor.com

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Bryan L. Clobes (*pro hac vice*)
1101 Market St., Suite 2650
Philadelphia, Pennsylvania 19107
Telephone: (215) 864-2800
Email: bclobes@caffertyclobes.com

*Attorneys for Plaintiffs*
[additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| IN RE NEST LABS LITIGATION | Case No. 3:14-cv-01363-BLF |
|---|---|
| | **CONSOLIDATED CLASS ACTION COMPLAINT (CORRECTED)** |
| | **JURY TRIAL DEMANDED** |

1    Plaintiffs Justin Darisse and Joshua Beloff ("Plaintiffs") bring this action on behalf of

2  themselves and all others similarly situated against Nest Labs, Inc.  Plaintiffs make the following

3  allegations based upon information and belief, except as to the allegations specifically pertaining to

4  themselves, which are based on personal knowledge.

5                                    <u>**NATURE OF THE ACTION**</u>

6    1.    This a class action against Defendant Nest Labs, Inc. ("Defendant") for using false

7  and misleading advertising, in website, print, and point-of sale promotional materials, as well as on

8  product packaging, to promote and sell the Nest Learning Thermostat ("Nest").  Nest is a wireless

9  thermostat that can be remotely controlled from smartphones and tablets.  In 2011, Defendant

10 launched Nest, a sleek "new generation" thermostat that was supposed to revolutionize thermostats,

11 not unlike the iPod revolutionized music playing devices.[1]  But Defendant released a fancy,

12 overpriced gadget (pictured below), which, while aesthetically "cool" like the iPod, fails at even

13 the most basic function of a thermostat: accurately gauging and controlling temperature.



---

[1]  Nest Labs, Inc. was founded by Matt Rogers, who was "responsible for iPod software development at Apple, from concept to production," and Tony Fadell, who "led the team that created the first 18 generations of the iPod and the first three generations of the iPhone."  *See* https://nest.com/about/

2.      Defendant bills Nest as a wireless "smart" thermostat that provides substantial cost savings over traditional thermostats through technological advancements that allow Nest to more accurately gauge ambient temperature.  But Nest suffers from significant manufacturing and design defects, which render it more *inaccurate than traditional thermostats*, and thus unsuitable for its intended purpose.

3.       Defendant promises that Nest will provide energy and cost savings that Nest does not provide.  In fact, Nest *increases* energy use and costs because, contrary to Defendant's representation that Nest uses "multiple temperature sensors to determine the ambient temperature with a high degree of accuracy," customer reports and Defendant's own admissions show that Nest is so defective that it cannot correctly gauge ambient temperature.

4.      Nest's defects cause the base and faceplate to heat up, thereby causing it to gauge temperatures to be anywhere from two to ten degrees higher than the actual ambient temperature in the surrounding room.  Nest users consequently do not receive the benefit of the advertised energy savings.  Instead, Nest's inaccurate temperature readings actually cause increased energy costs.

5.      Plaintiffs purchased Nest in 2013 at a substantial price premium expecting to secure the energy savings expressly promised by Nest in promotional materials.  Plaintiffs instead have suffered higher energy costs as a direct result of using this defective Product.  Accordingly, Plaintiffs bring this action seeking monetary, injunctive and declaratory relief.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and because members of the proposed class are citizens of a state different from the state of Defendant.

7.      This Court has general jurisdiction over Defendant because Defendant is headquartered in California.  Further, Defendant conducts substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the challenged mislabeling, misbranding, and marketing practices have been disseminated and committed in this District and because Defendant is headquartered in this District.

### THE PARTIES

9.      Plaintiff Justin Darisse is a citizen of Maryland, residing in Gaithersburg.  In the fall of 2013, he purchased Defendant's Nest Thermostat from Amazon.com for approximately $249.99. Prior to purchasing Nest, Darisse reviewed Defendant's marketing material and representations online, including that Nest provides energy and cost savings, as well as accurate temperature readings.  Based on those representations, he purchased Nest at a substantial price premium compared to traditional thermostats.  Shortly thereafter, Darisse received Nest in its common packaging.  He read and relied on Defendant's representations found on the Product packaging before installing the Nest Thermostat.  Darisse's Nest Thermostat packaging contained instructions to visit Defendant's website to check compatibility before installing the Product.  Following Defendant's instructions, he visited Defendant's website to check compatibility and watched the instructional video.  Darisse would not have purchased or installed Nest if he had known the truth about Defendant's representations concerning Nest.  Instead, he would have continued to use his traditional Honeywell Thermostat that retails for around $30.00.

10.      Plaintiff Beloff is a resident and citizen of Bellvue, Washington.  In 2013, Beloff purchased Defendant's Nest Thermostat from Lowes.  Prior to making this purchase, he reviewed Defendant's marketing material and representations online, including that Nest provides energy and cost savings, as well as accurate temperature readings.  Based on those representations, Beloff purchased Nest at a substantial price premium compared to traditional thermostats.  He read and relied on Defendant's representations found on the Product packaging before installing Nest. Beloff's Nest packaging included instructions to visit Defendant's website to check compatibility before installing the Product.  Following Defendant's instructions, Beloff visited Defendant's website to check compatibility and watched the instructional video.  He would not have purchased or installed Nest if he had known the truth about Defendant's representations concerning Nest.

Instead, he would have continued to use his traditional thermostat. As a result of Defendant's conduct, Beloff has suffered injury in fact and lost money.

11. Defendant Nest Labs, Inc. is a Delaware company with its headquarters and principal place of business located at 900 Hansen Way, Palo Alto, California 94304.

12. Defendant markets and sells its Nest "Learning Thermostat" widely throughout California, and nationwide. Defendant has manufactured, marketed, and sold Nest using the deceptive, false, and misleading claims described herein since at least 2011.

13. Defendant distributes Nest to several leading retailers including Amazon, EBay, Best Buy, Apple, Lowes, and Home Depot. These retailers purchase Nest for resale to Defendant's intended end-user customers like Plaintiffs and the Class.

14. Due to Nest's purported accuracy, and cost and energy saving capabilities, Nest sells for a retail price of $249 on Defendant's website[2] and for similar prices through Defendant's various distributors. The $249 purchase price reflects a substantial price premium over traditional thermostats.[3]

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.      The Nest Learning Thermostat: Defendant's Flagship Product**

15. Beginning in 2011, Defendant began to manufacture, market and sell its flagship product: the Nest Learning Thermostat.

16. Nest is an electronic, programmable, and self-learning WiFi-enabled thermostat that Defendant claims optimizes heating and cooling of homes to conserve energy. The Product consists of two primary pieces of hardware. The display contains the main printed circuit board ("PCB") and rotating ring and the base houses the connection terminals, bubble level, and holes for wall anchors. Neither can function independently; if separated, the display becomes inactive until reconnected to the base.

17. Nest is built around an operating system that allows interaction with the thermostat via spinning and clicking of its control wheel, which brings up option menus for switching from

---

[2] https://store.nest.com/product/thermostat/

[3] For example, a Honeywell Digital Programmable Thermostat is available for $32.87. *See, e.g.*, http://www.zorotools.com/g/00055005/k-

heating to cooling, access to device settings, energy history, and scheduling.  Users can control Nest manually, without a touch screen or other input device.  Users also may control Nest using applications compatible with smart phones and other devices.

18.     Nest purportedly uses proprietary, energy-saving technology called "Nest Sense." Nest Sense works through the Product's sensors, hardware and algorithms.  Nest Sense's job is to gather data to use in the Product's calculations to more efficiently manage a home's HVAC system.  To that end, Nest is intended to gather data from the following sources:  three temperature sensors, purportedly designed to get a more precise measurement than a traditional thermostat; a humidity sensor; motion and light sensors that detect activity in the room at a 150-degree angle; and a WiFi connection to secure weather data from the Internet.

19.     Using data from these sources, Nest Sense creates a schedule for HVAC systems that consist of specific times of the day on each day of the week at which to activate HVAC systems, and auto-away times, which are times that Nest determines the user is not typically at home and utilizing an HVAC system.  In short, Nest is supposedly able to optimize a home's HVAC settings through superior technology and minimal user interface to minimize energy costs.

20.     Defendant has released two generations of Nest thermostats.  The second generation was released in October 2012 and incorporates a new aesthetic design and new software. However, the technology utilized is substantially identical in both product offerings.

21.     Defendant has sold hundreds of thousands of Nest Thermostats.  It is estimated that Defendant has sold and continues to sell some 100,000 Nest Thermostats per month at roughly $250 per unit.[4]  Nest Thermostats are available in major retail stores nationwide and online.  At a sales price of approximately $250, Nest retails at a substantial premium over traditional thermostats.

### B.     Defendant's False and Misleading Marketing of Nest

22.     Defendant falsely markets Nest as an easy-to-use, self-programming device that "saves energy" and decreases utility bills.  Defendant represents that Nest is a wireless "smart" thermostat that provides substantial cost savings over traditional thermostats through technological

---

[4] http://www.businessinsider.com/nest-revenue-2014-1

advancements that allow Nest to more accurately gauge ambient temperature.  Defendant's

marketing conveys a simple message: Nest saves money.

23.     Defendant misrepresents that Nest's "sensors are designed to be highly accurate and

react to changes in the ambient temperature more readily than most thermostats"[5] and that "[t]hree

temperature sensors track your home's temperature and how quickly it changes."[6]  For example, on

its website, Defendant represents that:

> Nest uses multiple temperature sensors to determine the ambient temperature with a high
> degree of accuracy.  The Nest Thermostat's sensors are tuned to be most useful for keeping
> your home consistently comfortable.  We found that responding rapidly to temperature
> changes gives your Nest Thermostat the most accurate data to work from.
> ….
> Nest Thermostat's sensors are designed to be highly accurate and react to changes in the
> ambient temperature more readily than most thermostats.[7]

24.     Visitors to the Nest Website find rotating images of a Nest next to energy-saving

slogans.  As shown below, Defendant claims that Nest "Manages half your home's energy":



---

[5] *See, e.g.*, http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat

[6] https://nest.com/thermostat/inside-and-out/

[7] http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat

1    25.    Defendant further claims that Nest "Helps you save energy":



26.    The images provide a link so that potential customers can "Take a Tour with Nest." The "Tour" video assures prospective purchasers that Nest will revolutionize the way that they manage utility expenses.  The "Tour" begins with an image of a plain traditional thermostat next to the tag-line "We didn't think thermostats mattered either":



27.     The video then goes on to explain why, according to Defendant, thermostats *do matter* - because "they control half your energy bill":



28.     Because thermostats matter to your energy bill and are directly responsible for energy costs, in the next frame of the video, Defendant introduces the Nest Learning Thermostat to manage those expenses:



29.   As the video continues, a Nest replaces the drab traditional thermostat on the wall, and the video explains that Nest "won't waste energy when you're out":



30.   Defendant's website also prominently states that:  "We didn't think thermostats mattered either.  Until we found out they control half of your home's energy.  That's more than appliances, lighting, TVs, computers and stereos combined.  THE PROBLEM: If your thermostat isn't programmed, you could be wasting around $173 a year.  But many of us don't program our thermostats – they're just too complicated.  What if you did?"

31.   During the class period, Defendant similarly represented that: "We didn't think thermostats mattered either.  Until we found out they control half of your home's energy.  That's more than appliances, lighting, TV's, computers and stereos combined.  THE PROBLEM: 89% of programmable thermostats waste energy – about $173 a year, on average.  They're so complicated that most people don't bother to program them. …. So we made it simple. **Nest saves energy. Automatically**. (emphasis in original).[8]

_____

[8] https://nest.com/thermostat/saving-energy/

32.     Next to Defendant's energy saving message, the website provides an interactive image of a balancing scale to illustrate Nest's energy saving capability.  On the left half of the scale there are images of a droplet of water, a refrigerator, a light bulb, a computer, and a washing machine.  On the right half of the scale there is an image of a traditional thermostat.  Above the traditional thermostat, Defendant includes a large circle with the emboldened phrase: "Half of your home's energy bill."



33.     Upon dragging the cursor across the image, it transforms.  A Nest replaces the traditional thermostat, a substantial portion of the "energy bill" circle falls away, and the statement "A correctly programmed thermostat can save about 20% on your heating and cooling bill" appears.



34.     After outlining the so-called home-energy management "problem," Defendant provides the solution:  "So we made it simple.  Nest saves energy.  Automatically."



CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 14-cv-01363-BLF

1        35.      To explain how "Nest saves energy.  Automatically," Defendant represents that the

2    Nest "Leaf appears when you choose a temperature that will save energy.  Changing the temp just

3    one degree can save up to 5% on your energy use."   Defendant further represents that after the user

4    manually adjusts the temperature settings to energy-efficient levels for only a few days to "teach"

5    Nest Sense, Nest Sense then determines and sets optimal temperature settings for specific days and

6    times "to save you more energy."



36.     To depict "How Nest helps you save," Defendant also employs illustrative examples of families who would realize energy savings by using Nest.  For example, Defendant introduces "Tina and Joe" who are "retired in Phoenix in a 2,000 sq. ft. home," and whose "grandkids often come over in the afternoons."  Nest represents that Tina and Joe could realize "22% Savings." Defendant further explains "Auto-Schedule" helped them save: "Joe looked for the Nest Leaf and turned the temp up to 75°F/25°C instead of their usual 73°F/23°C.  Auto-Schedule learned the habit and helps them save."

37.     Defendant's website also makes clear that these are not vague assertions, but factual claims premised on Defendant's own research and testing.  For instance, with respect to Tina and Joe, Defendant explains:

> Retired couple.  Home a lot.  Grandchildren stay at their house in the afternoon.
>
> Live in a 2,000 sqft home.  Forced air. Electric heat. AC.
> Heating schedule: 7am 72°F, 9pm 68°F. Away temp 62°F.
> Cooling schedule: 7am 74°F, 9 am 76°F, 3pm 74°F, 9pm 73°F.
> Away temp 79°F.
>
> Phoenix summer is hot.  While Tina and Joe's schedule doesn't have a large increase in temperature during the day, they made a conscious decision to increase the temp by 2°F when the grandkids aren't over.  This schedule is saving them 10% on their cooling bills.
>
> They like to go out to play golf twice a week, so Auto-Away saves them 20% on those days.  This is 6% savings total.  Finally, Airwave is working quite well in their dry, hot home and cutting their AC runtime by 30%.  That saves them 9% on their cooling bills.  All together, they are saving 23% with their Nest Thermostat in the summer.
>
> The winter is mild so heating doesn't turn on much during the day.  However, it turns on a lot at night because it gets cold.  They've turned down the night temperature, so they are saving 18% (mild weather places have larger percentage savings).  Auto-Away in the winter is saving them an additional 2%.  In the winter, they are saving 20%.
>
> With cooling costing 5 times more than heating, they're saving 22% on their heating and cooling costs with a Nest Thermostat.

38.     The statements regarding Tina and Joe above, as well as many others referenced herein, are affirmative assertions that Defendant communicates as fact.  On its website (http://support.nest.com/article/Explaining-Nest-thermostat-numbers), Defendant attempts to provide a factual basis for every "number" discussed on its website, including savings figures associated with programming, "Nest Leaf" cost savings, Auto-Away, seasonal savings and "Saving Energy Homes" examples.

39.     Defendant's website goes as far as to provide access to an internal whitepaper entitled, "Nest Learning Thermostat Efficiency Simulation: Update Using Data From the First Three Months."  The paper details internal testing conducted on Nest that informs the claims made on Defendant's website, particularly as concerns cost savings associated with a switch to Nest from traditional thermostats.

40.     If a potential customer remains unconvinced after reviewing the above depictions of "How Nest helps you save," Nest further provides an "Energy Savings Video."  The video begins: "Most of us will spend around $30,000 heating and cooling our homes during the life of our furnace or air conditioner."



41.     As an image of numerous hands repeatedly adjusting a basic thermostat materializes, the video continues:  "In the past there weren't any easy ways to lower that amount. You could adjust your thermostat about 1500 times a year …"



42.     Then, a terrifically complicated looking programmable thermostat appears, and the video explains that, in the past, the only other alternative to 1500 adjustments was to "battle with a complicated programmable thermostat."



43.     Finally, at the end of the video, a sleek Nest appears in place of the tedious alternatives of the past, and the video elucidates: "Now there is the Nest Learning Thermostat which is full of tools to save energy automatically."



44.     As part of Defendant's save energy and money campaign, Defendant has also made the following representations to induce customers to purchase Nest:

- [Nest] can automatically lower air-conditioning costs up to 30% [and] cuts AC runtime up to 30%;

- Teach it well and Nest can lower your heating and cooling bills up to 20%;

- Most thermostats waste 20% of your heating and cooling bill. Nest stops the waste;

- Nest is paying for itself.  Auto-Schedule makes it easy to create an energy efficient schedule that can help you save up to 20% on your heating and cooling bills.  All Nest's features combined can get you even bigger savings; and

- Save energy. Make money.[9]

---

[9] http://nest.com/saving-energy/

45.     Similarly, Nest's packaging reinforces the energy saving message:

Learning Thermostat™

Programs itself.

**Saves energy**. (emphasis added)



46.     Neither the packaging nor the materials displayed on Defendant's website disclose that Nest is defective.

**C.      Nest Does Not Function as Advertised**

47.     Contrary to Defendant's colorful advertising campaign, Nest does not accurately read temperature and, as a result, does not save energy or decrease energy bills.  In fact, Nest *increases costs* because Nest heats up, which causes Nest's temperature reading to be from two to ten degrees higher than the actual ambient temperature in the surrounding room.  Indeed, as Defendant explains: "Changing the temp just one degree can save up to 5% on your energy use."[10] Thus, according to Defendant's reasoning, an inaccurate temperature reading of two to ten degrees could increase your energy use from 10% to 50%.

48.     Nest is unsuitable for its intended purpose because it is incapable of accurately gauging the ambient temperature in the surrounding room.  The very features that Defendant claims set Nest apart from other thermostats, such as Nest's WiFi connectivity, bright LCD screen 320x320px display, built in rechargeable lithion ion battery, multiple-sensors, and sensor window, cause Nest to heat up.  Once it heats up, Nest reports that the temperature is warmer than the real

---

[10] http://nest.com/saving-energy/

temperature in the room.  Nest thereafter keeps the air conditioner running longer than necessary because it is incapable of accurately gauging the temperature.

49.     The following example demonstrates the impact of Nest's WiFi connectivity on Nest's temperature readings.  On January 26, 2014, a Nest user reported on the Nest Community Website that: "Nest was consistently reading 2 degrees above my digital room thermometer.  My Nest is not placed where sunlight or other light could impact it.  I find the two degree difference annoying but based on user comments it appears this is normal for the Nest."  Then she noticed that her Nest was "4 to 6 degrees" above her digital room thermometer.  To resolve the problem, she "tried turning the unit off for a while and then turning it back on but the significant temperature difference persisted."  She then "disconnected the Nest from [her] WiFi connection."  Within about an hour the temperature went back to the "normal 2 degree difference."  But as soon as she "re-established the WiFi connection, [the] larger temperature difference returned."  The review concluded:  "I Think this unacceptable for the top of the price point WiFi thermostat.  I would never purchase this brand again."

50.     Defendant's depiction of "Tina and Joe," whose "Auto-Schedule" helped them save money and energy demonstrates how Nest's inaccurate temperature readings eradicate energy savings.  As mentioned above, Defendant states: "Joe looked for the Nest Leaf and turned the temp up to 75°F/25°C instead of their usual 73°F/23°C.  Auto-Schedule learned the habit and helps them save."  If the current temperature in Tina and Joe's house is 80 degrees and Joe sets the temperature to 75 degrees instead of their usual 73 degrees, Nest's inaccurate temperature readings will keep the air conditioner running even when the actual ambient temperature in the room has reached 75 degrees.  Since the air conditioner would remain on, the actual temperature in the room would still be Tina and Joe's usual 73 degrees.  As a result, none of the purported savings would be realized.

**D.      Customer Reports Show That Nest Inaccurately Reads Temperature and That Defendant's Cost, Energy, and Accurate Temperature Representations Are False and Misleading**

51.      An incredible number of Nest customers have reported identical experiences of having Nest heat up, inaccurate temperature readings, and the air conditioner running even when no longer needed, resulting in cost increases and excessive energy use.  Indeed, a simple use of the search term "temperature" on Defendant's "Nest Community" webpage, where customers can post comments and questions, results in dozens of separate discussions concerning the inaccuracy of Nest Thermostats' temperature readings. [11]

52.      The following are just a few examples of customers reporting inaccurate temperature readings and increased energy use:

In January 2013, a customer wrote on the Nest website in reference to "Internal Heat and Nest Operation" that:

> **I have seen this concern on other forums and have noted it as well.  If I keep a fan on both the nest and a control digital thermometer, the temperature readings and furnace on and off temps are very accurate to the room air and have equal readings on both.  When I take the fan away, the Nest gradually warms up to 1.5* - 2.0* warmer than the control thermometer. Is this due to the shed heat from battery charging or WiFi circuitry?  Both the Nest and the Control thermometer are on an interior wall and within 2" of each other. This, obviously, messes up the set points, furnace on and off temps, and getting MY LEAFS!!!!!! (if I turn the Nest up to get air temp true) What can be done to recalibrate actual temp vs. perceived Nest temp?** (emphasis added).[12]

On February 20, 2013, another customer reported on the Nest website:

> **It's 1030 and my Nest says the ambient temp is 74 degrees. My other thermometers show 64 and it is pretty chilly. It had a 20 degree split last night.**
>
> **The unit is warm to the touch, actually probably close to the temp shown and the mounting plate is warm. ….** (emphasis added).[13]

---

[11] *See* https://community.nest.com/search.jspa?q=temperature

[12] https://community.nest.com/message/1330#1330

[13] https://community.nest.com/message/2602#2602

In April 2013, a customer wrote on the Nest website:

> **We have several Nest controlled RTUs at our church operating for about a month now.  One was displaying what I thought was an inaccurate inside temp of 91 degrees yesterday, but I found out the case was very hot to the touch...so actually it was reading correctly.  There is a possible problem with the unit and I turned it off, but why did the Nest get hot?** (emphasis added).[14]

On April 24, 2013, a customer started a thread on the Nest website entitled "Warm Nest is skewing actual temperatures," and wrote that:

> **… Nest feels warm to the touch.  We keep our house cold; 60 degrees during the day and perhaps 65 in the evening when we're home.  We dress warmly.  But the other night it was COLD despite the thermostat reading of 67.  I place a very accurate mercury lab thermometer. At the Nest location and observed that is was consistently 4-5 degrees colder that what the Nest was displaying.  As I grabbed the ring to turn the temperature, I noticed that it felt not like "cold steel" but was slightly warm.  The plastic face felt as warm. I pulled the thermostat off the base and place my lips to,the back of it.  It felt warm. I immediately knew why my readings were off.  So what is going on?  What's is my thermostat warm?**.... (emphasis added).[15]

In April 2013, another customer wrote on the Nest website:

> **I taped two different digital thermometers next to Nest and waited a day for temps to settle … Nest reads at least 2 degrees warmer than the calibrated thermometers….  So I feel this poor temperature calibration provides a false sense of energy savings.  Nest needs to provide better temperature calibration….**
>
> **I just spoke with Nest 2nd level support.  He confirms for me that Nest engineers feel that temperature calibration (compared to another thermometer/thermostat) might be within 4 degrees difference ….  So although I measured a range of temp differences with Nest being 1.6 to 2.3 degrees higher than two different digital thermometers, this is "insignificant," to quote Nest.  To paraphrase, the difference might be due to what I call self-heating from the internal WiFi operation, and in the way in which Nest calculates temperature.  So I see that by design, Nest's engineers expect that Nest will: 1. Never show a temperature accurate to a digital thermometer/thermostat (within 4 degrees; 2. Temperature reading will vary depending on self-heating from WiFi, display use…**[16] (emphasis added).

---

[14] https://community.nest.com/thread/1739.
*See also* https://community.nest.com/message/4809#4809 (showing that, as with many of the customer complaints set forth herein, a Nest representative reviewed the complaint).

[15] https://community.nest.com/message/4711#4711

[16] https://community.nest.com

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 14-cv-01363-BLF

21

On May 27, 2013, another customer wrote on the Nest website:

> **Nest thinks temp is about 3 degrees warmer than it is, and the A/C seems to run more often than it used to when set on 74**. I checked with an IR laser thermostat throughout the house and it consistently read 71, but the Nest was measuring 74. …. Curiously, **when I aimed the laser directly on the Nest faceplate, it measured 74 while the surrounding wall measured 71**. **I think the electronics within the Nest are actually heating the inside of it up 3 degrees higher than ambient.** And my Nests are not in the sunlight. Definitely need temperature calibration." (emphasis added).[17]

On July 10, 2013, another customer wrote on the Nest website:

> This is not workable.  **The Nest display creates heat, which will cause the Nest to sense a temperature that is warmer than it really is in the room.** (emphasis added).[18]

On July 25, 2013, another customer wrote on the Nest website:

> I installed a Nest last week and I was initially pleased with its performance.  Last night however, I noticed that the room seemed hot, so I walked over to the Nest and **it was showing that the temperature was 96 degrees, and it was trying to cool to 78 deg.  The actual room temperature was close to 82 degrees**… (emphasis added).[19]

On August 2, 2013, a fellow customer wrote on the Nest website:

> We've put a thermometer in the room next to the NEST, and it's showing 3 to 5 degrees colder than the NEST!  When we look at the NEST App on an iphone, it shows that it's currently 75 - and still cooling "for 30 minutes".  You've got to be kidding!  We bump it up to 77 just to get it to turn off, put it back to 76, and a half hour later it's on again saying it's 78 and cooling "for 3.5 hours", even though our second thermometer shows it's already 75!  Trust me, when it's 92 outside, 75 feels COLD.  If I switch my system back to my previous t-stat with a .5 swing, everything feels fine.
>
> **PLEASE NEST... LISTEN to your customers!  If it's true that only .01% of customers actually tell you there's a problem, then the 40+ votes on this post should concern you.** (emphasis included).[20]

On November 26, 2013, another customer wrote on the Nest website:

> I installed mine about November 15th, 2013.  It has the same issue - indicating a temperature that's consistently a little more than two degrees higher than actual room temperature.  That's irritating for an expensive, state-of-the-art device.  More so if the

---

[17] https://community.nest.com

[18] https://community.nest.com/ideas/2169#comment-4213

[19] https://community.nest.com/message/8163#8163

[20] https://community.nest.com/ideas/1938

supplier does not consider the problem significant.  The primary purpose of this device depends upon ACCURATE TEMPERATURE REGULATION.[21]

On December 14, 2013, another customer wrote on the Nest website:

Wow - I am not impressed with NEST.  **I had the same problem with it reading close to 10F higher. The base plate was definitely warm to the touch** …. I also called support before installation to check compatibility and I was told it would be fine. (emphasis added).[22]

On May 18, 2013, another customer wrote on Amazon.com:

**There seems to be a major design flaw in this product.  It fails at the most basic level of thermostat functionality, which is the measuring of Room Temperature!**

**It always shows the room temp 4-6 degrees warmer than it really is!!**  It is also very slow in changing.  For example, I had 3 thermostats side by side, one of which was the Nest.  I left the doors/windows open, the other 2 OLD thermostats reached 62 degrees simultaneously with in about 5-10 minutes.  The Nest was still showing 74 an hour later!!! That's grossly wrong!!!

I tried 2 Nest thermostats and both had the same problem even after being on Tech Support line for 3 days, downloading the latest firmware, resetting to factory defaults and disabling wifi.  It still reads the temp 4-6 degrees warmer.

Finally the Tech Support lady said, it is what it is, and you can return it if you can't live with it!!  I asked if this is something they are working on?  She couldn't even confirm that. It is a shame such an ambitious piece of technology can not even read the temp correctly! How can you use a thermostat that thinks the room is sometimes 8 degrees hotter than it really is? …. (emphasis added).[23]

On July 30, 2013, another customer wrote on Amazon.com:

The [Nest] wiring base was very warm to touch, not good.  Then [Nest support] tell[s] me to try to return it to Amazon, but it's after the return window by 10 days. ….

**Apparently this is a known issue internally Nest corporate and engineering, they are investigating, but there is no time frame for the fix,** and likely a new base design would be the fix.  They are not at all clear as to how they will address this publicly (replacing existing bases automatically, case-by-case, free, charge (which would be ludicrous if they charged)).[24]

---

[21] https://community.nest.com
[22] https://community.nest.com

[23] http://www.amazon.com/Nest-Learning-Thermostat-Generation-T200577/product-reviews

[24] http://www.amazon.com/Nest-Learning-Thermostat-Generation-T200577/product-reviews

On October 22, 2012, another customer wrote on Amazon.com:

> I bought the second generation Nest from Lowes the day it was released.  I verified the compatibility on Nest's website.  ….
>
> **Five days later I noticed that the temperature reading on Nest was a tad higher than the actual room temperature.  When my room was at 78 degrees Nest showed 82.  A few hours later the reading went to 83 and kept increasing.  I felt the warmness on the surface of the (beautiful) display so I took the unit off the base from the wall.  The back side of Nest was hot.** It felt like it's been doing some heavy duty computations.[25] (emphasis added).[26]

### E.   Defendant Knows, and Certainly Should Know, of Nest's Defects

53.   Defendant knows about Nest's temperature reading defect.  Indeed, many of the reviews above were posted directly on the Nest website.  Additionally, as set forth above, unhappy customers report that Defendant knows about the defects:

a. I just spoke with Nest 2nd level support.  He confirms for me that Nest engineers feel that temperature calibration (compared to another thermometer/thermostat) might be within 4 degrees difference;

b. [E]ven after being on Tech Support line for 3 days, downloading the latest firmware, resetting to factory defaults and disabling wifi.  It still reads the temp 4-6 degrees warmer.  Finally the Tech Support lady said, it is what it is, and you can return it if you can't live with it!!  I asked if this is something they are working on?  She couldn't even confirm that.; and

c. Apparently this is a known issue internally Nest corporate and engineering, they are investigating, but there is no time frame for the fix, and likely a new base design would be the fix.  They are not at all clear as to how they will address this publicly (replacing existing bases automatically, case-by-case, free, charge (which would be ludicrous if they charged)).

54.   Further, Defendant has responded to complaints about the problem both on its own website and on Amazon.com.  The following exchange (one of many) that took place on Amazon.com between an unhappy customer and the "Nest Support-Manufacturer" exemplifies Defendant's knowledge of the problem:

**Customer**, December 28, 2013:

> We installed [Nest] after getting it for Christmas.  The temperature is 9 degrees off, and gets even more off the longer we leave it on.  Yes it looks nice, but if you want something in your house that actually regulates temperature, go with a reliable thermostat company.

---

[25] https://community.nest.com

[26] http://www.Amazon.com/Nest-Learning-Thermostat-Generation-T200577/product-reviews/B009GDHYPQ/ref=dp_top_cm_cr_acr_txt?showViewpoints=1

**Nest**, December 30, 2013:

> Comparing the temperature the Nest Thermostat reads to other thermostats and thermometers is tricky.  The way thermostats calculate temperature is often different, and seemingly small differences in the environment can dramatically affect the temperature your thermostat shows.  We've put together some details on why the number might seem different than what you would expect at the link below: http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat  ….

**Customer**, December 30, 2013:

> We installed two nests, both from Amazon, both did the same thing.  And I understand that some thermostats read differently, but when you have thermostats and plain thermometers reading the same, it is different.  I read the crap you posted on your website, it didn't help. ….
> The crap is already in a box on its way back to Amazon to be refunded.  There was such a long wait for phone support and no reply to an email.  Your support is just about as good as your thermostats are at reading temperatures.[27]

55.     The link that Defendant provided to the customer above directs users to a "Nest Support" page entitled "Why does the temperature the Nest Learning Thermostat detects seem different than my old thermostat?"  But Defendant's so-called explanation merely exculpates Defendant, and blames Nest-victims for Defendant's dysfunctional thermostat.  Not only does Defendant's "explanation" unfairly blame Nest-victims, it operates to actively conceal the fraud perpetrated by Defendant.  For instance, Defendant claims that the temperature "variations" may be due to "Manual Thermostat Adjustments" because "[w]hen making many adjustments on your Nest Thermostat, the warmth of your hand may cause the Nest Thermostat's sensors to raise the ambient temperature displayed."[28]  Thus, according to Defendant, the momentary adjustment by hand is causing the Nest unit to heat up.  But if a brush against a human hand can cause Nest to heat up, surely warmth generated by the components *inside* Nest are similarly able to cause the temperature gauge to display an inaccurately high reading.

56.     On the same page, Defendant also suggests that "Room Placement" may be the cause of the temperature "variations":

> After replacing your old thermostat with a Nest Thermostat, your previous thermostat may display a different ambient temperature than your Nest.  In many cases, this is because your previous thermostat is no longer installed on your wall.  Surprisingly, the air temperature

---

[27] http://www.amazon.com/review/R1KRYZQSYOKND2/ref=cm_cr_pr_cmt?ie=UTF8&ASIN=B009GDHYPQ&linkCode=&nodeID=&tag=#wasThisHelpful

[28] http://support.nest.com/article/Why-does-the-temperature-Nest-detects-seem-different-than-my-old-thermostat

can vary dramatically between two areas of the same room that are separated by only a few feet. To properly compare your old thermostat to the Nest Thermostat, hold your old thermostat up to the wall within a few inches to the right or left of the Nest Thermostat. It is important to make sure that both thermostats are the same height from the floor. Be sure to hold your old thermostat in a way that won't cause its sensors to detect the warmth of your hand. After several minutes your old thermostat should adjust its detected temperature.

But, as set forth in the examples above, customers have done just as Defendant instructs and the temperature reading is still off:

    a.    I had 3 thermostats side by side, one of which was the Nest. I left the doors/windows open, the other 2 OLD thermostats reached 62 degrees simultaneously with in about 5-10 minutes. The Nest was still showing 74 an hour later!!! That's grossly wrong!!!

    b.    [W]hen I aimed the [IR] laser directly on the Nest faceplate, it measured 74 while the surrounding wall measured 71. I think the electronics within the Nest are actually heating the inside of it up 3 degrees higher than ambient. And my Nests are not in the sunlight.

57.    Finally, Defendant knew or should have known about the problems with Nest's temperature reading based on pre-market testing. Testing a thermostats' temperature reading before promising that it is "accurate" and will result in energy savings is standard industry practice.

**F.    The NAD Recommended that Defendant Discontinue Advertising Claims**

58.    Defendant's false and misleading representations concerning Nest have been condemned by the National Advertising Division of the Council of Better Business Bureaus ("NAD"), an investigative unit of the advertising industry's self-regulatory system. On June 20, 2013, the NAD took the extraordinary step of recommending that Defendant stop making a number of inaccurate and misleading claims about Nest thermostats. For example, the NAD recommended that Defendant stop representing that its Nest Thermostats "cut AC runtime up to 30%."[29] Following review of Defendant's evidence, the NAD also urged Defendant to discontinue its unsupported specifically quantified claims such as "89% of other programmable thermostats are not programed because they're so complicated that most people don't bother to program them" and "other thermostats waste energy."[30]

---

[29] http://www.asrcreviews.org/2013/06/nad-recommends-nest-labs-modify-discontinue-certain-advertising-claims-for-nest-programmable-thermostats-claims-challenged-by-honeywell/

[30] http://www.asrcreviews.org/2013/06/nad-recommends-nest-labs-modify-discontinue-certain-advertising-claims-for-nest-programmable-thermostats-claims-challenged-by-honeywell/

**CLASS ACTION ALLEGATIONS**

59.     Plaintiffs bring this action on their own behalves, and on behalf of the Class defined as all persons in the United States who purchased Nest Thermostats for personal or household use. Excluded from the Class are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased Nest for resale, and the Judge(s) assigned to this case.

60.     Rule 23(a)(1) requires the class to be sufficiently numerous such that joinder of all class members is impracticable.

61.     Defendant sells hundreds of thousands of Nest Thermostats.  It is estimated that Defendant sells 100,000 Nest Thermostats per month at roughly $250 per unit.[31]  Nest Thermostats are available in major retail stores nationwide and online.  Based on the popularity of Nest, there are likely millions of Class members.  Accordingly, members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  That information is in the possession of Defendant.  Class members may be notified of the pendency of this action by mail, email, and/or publication through the distribution records of Defendant and third party retailers and vendors.

62.     Rule 23(a)(2) requires the class claims to contain common issues of fact or law. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

a.   Whether Defendant breached an express warranty made to Plaintiffs and the Class;

b.   Whether Defendant breached an implied warranty made to Plaintiffs and the Class;

c.   Whether Defendant advertised or marketed Nest Thermostats in a way that was false or misleading;

d.   Whether Defendant's conduct was false, misleading, or reasonably likely to deceive ordinary consumers;

---

[31] http://www.businessinsider.com/nest-revenue-2014-1

e. Whether Class members have been injured by Defendant's conduct;

f. Whether Class members suffered an ascertainable loss as a result of Defendant's misrepresentations;

g. Whether Class members are entitled to damages, restitution, injunctive relief, and/or monetary relief and, if so, the amount and nature of such relief;

h. Whether Defendant violated California Civil Code §§ 1750, *et seq.*;

i. Whether Defendant violated California Business & Professions Code §§ 17200, *et seq.*; and

j. Whether Defendant violated California Business & Professions Code §§ 17500, *et seq.*

63. The claims of the named Plaintiffs are typical of the claims of the Class in accordance with Rule 23(a)(3) because Plaintiffs (a) were exposed to Defendant's false and misleading packaging, marketing, and promotion of Nest Thermostats; (b) relied on Defendant's misrepresentations; and (c) suffered a loss as a result of their purchase. Each Class member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

64. Rule 23(a)(4) requires that the class representative and class counsel adequately represent the Class.

65. Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

66. Rule 23(b)(3) requires that common issues predominate over any issues impacting individual Class members. The common issues identified above predominate. Rule 23(b)(3) also requires that the class action be superior to all other available means of fair and efficient adjudication of the Class' claims.

67.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  The monetary value of each individual Class member's claim is small compared to the burden and expense of individual litigation.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Judicial economy is served by litigating the Class claims in one case.

<u>**COUNT I**</u>
**Violation Of California's Consumers Legal Remedies Act ("CLRA"),**
**California Civil Code §§ 1750, *et seq.***

68.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

69.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

70.     Plaintiffs and the Class members are consumers who purchased Nest for personal, family or household purposes.  Plaintiffs and the Class members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).  Plaintiffs and the Class members are not sophisticated experts with independent knowledge of thermostat design, temperature reading, energy saving, cost saving, or other characteristics of thermostats.

71.     The Nest Thermostats that Plaintiffs and other Class Members purchased from Defendant were "goods" within the meaning of Cal. Civ. Code § 1761(a).

72.     Defendant's actions, representations, omissions and conduct have violated and continue to violate the CLRA because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers.

73.     Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have …." Cal. Civ. Code § 1770(a)(9) further prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

74.     Defendant violated Cal. Civ. Code § 1770(a)(5) and (a)(9) by misrepresenting that Nest was capable of accurately reading temperature and providing energy and cost savings as described above.  Defendant knew, or should have known, based on pre-market testing, as well as customer complaints submitted directly to Defendant and posted on third-party websites, that Nest was not capable of accurately reading temperature, and that, as a result, it would not provide energy and cost savings.

75.     A reasonable consumer would not have purchased or paid as much for Nest had Defendant disclosed its defective condition or refrained from the affirmative misstatements identified above because that information is material to a reasonable consumer.

76.     Plaintiffs and the Class suffered injuries caused by Defendant because: (a) they would not have purchased Nest Thermostats on the same terms if the true facts were known concerning Nest's temperature readings, and Defendant's energy and cost savings representations; (b) they paid a substantial price premium compared to traditional thermostats due to Defendant's representations that Nest would accurately read temperature and provide energy and cost savings as described above; (c) they did not receive the promised energy-cost savings; and (d) Nest did not have the characteristics, uses, or benefits as promised.

77.     On or about February 7, 2014, prior to filing the Darisse action, a CLRA notice letter was served on Defendant which complies in all respects with California Civil Code § 1782(a).  Plaintiffs both sent Defendant a letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and desist from such

violations and make full restitution by refunding the monies received therefrom.  True and correct copies of Darisse's and Beloff's letters are attached hereto as Exhibits A and B, respectively.

78.     Wherefore, Plaintiffs seek damages, restitution, and injunctive relief for this violation of the CLRA.

**COUNT II**
**Violation Of California's Unfair Competition Law ("UCL"),**
**California Business & Professions Code §§ 17200, *et seq.***

79.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

80.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

81.     Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

82.     Defendant violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, and by breaching its express and implied warranties as described herein.

83.     Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.  Defendant's practice of promising energy and cost savings and then delivering an exorbitantly expensive defective thermostat is of no benefit to consumers.  Defendant's conduct of selling Nest despite pre-market tests showing the inaccuracy of Nest's temperature readings, or, alternatively, Defendant's failure to test Nest before releasing it on the market offends public policy.  Further, Defendant's refusal to remedy the defect or its representations even after numerous customers have requested that Defendant do so is unscrupulous.  Defendant's conduct has also impaired competition within the thermostat market by

inflating the cost of thermostats through the use of inaccurate representations and has prevented Plaintiffs from making fully informed purchasing decisions regarding thermostats.

84.     Defendant violated the "fraudulent" prong of the UCL by making misrepresentations about Nest Thermostats, as described herein.  Defendant's misrepresentations and omissions regarding Nest are likely to deceive a reasonable consumer, and thereby would be material to a reasonable consumer.

85.     Plaintiffs and the Class members acted reasonably when they relied on Defendant's misrepresentations and omissions and purchased Defendant's products.  Moreover, Plaintiffs and the Class members are presumed to have relied on such misrepresentations and omissions because they appeared in the pervasive advertising campaigns described above and related to material facts – Nest's ability to accurately gauge ambient temperature and to save consumers money over traditional thermostats.

86.     Plaintiffs and the Class members are not sophisticated experts with independent knowledge of thermostats, or how thermostats could result in energy and cost savings.  Thus, Plaintiffs and the Class members acted reasonably when they purchased Defendant's products based on their belief that Defendant's representations were true.

87.     Plaintiffs and the Class lost money or property as a result of Defendant's UCL violations because: (a) they would not have purchased Nest on the same terms if the true facts were known concerning the inaccuracy of Nest's temperature readings, and the falsity of Defendant's energy and cost savings representations; (b) they paid a price premium for Nest Thermostats due to Defendant's promises and representations described herein; (c) they did not receive the promised energy-cost savings; and (d) Nest Thermostats did not have the characteristics, uses, or benefits as promised.

88.     All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized conduct that originates from Defendant's headquarters in California and is still perpetuated and repeated, both in California and nationwide.

89.     Plaintiffs request that this Court enter such orders or judgments to enjoin Defendant from continuing its unfair, unlawful, and deceptive practices and to restore to Plaintiffs and the members of the Class any money Defendant acquired by unfair competition, as provided in Cal. Bus. & Prof. Code § 17203, and for such other relief as set forth below.

**COUNT III**
**Violation Of California's False Advertising Law ("FAL"),**
**California Business & Professions Code §§ 17500, *et seq.***

90.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

91.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

92.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

93.     Defendant committed acts of false advertising, as defined by §§17500, *et seq.,* by making misrepresentations about Nest's accuracy and energy and cost saving capabilities as described herein, as well as by failing to disclose that Nest is inherently defective because it heats up and fails to correctly record ambient temperature, thereby increasing energy usage and costs.

94.     Defendant disseminated from its headquarters in California through California and the United States, affirmative misstatements and omissions that were untrue or misleading.

95.     Defendant knew or should have known through the exercise of reasonable care (i.e. pre-market testing) that their representations about Nest were untrue and misleading.

96.     Defendant's misrepresentations and omissions concerned material facts, namely Nest's ability to correctly gauge ambient temperature, to reduce energy use, and to reduce costs.

As such, Defendant's actions in violation of §§ 17500, *et seq.* were false and misleading such that the general public is and was likely to be deceived.

97.     Plaintiffs and the Class lost money or property as a result of Defendant's FAL violations because:  (a) they would not have purchased Nest on the same terms if the true facts were known concerning the inaccuracy of Nest's temperature readings, and the falsity of Defendant's energy and cost savings representations; (b) they paid a price premium for Nest Thermostats due to Defendant's promises and representations described herein; (c) they did not receive the promised energy-cost savings; and (d) Nest Thermostats did not have the characteristics, uses, or benefits as promised.

98.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its false advertising and to restore to Plaintiffs and members of the Class any money Defendant acquired by unfair competition, and for such other relief set forth below.

**COUNT IV**
**Breach Of Express Warranty**

99.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

100.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

101.     Plaintiffs, and each Class member, formed a contract with Defendant at the time Plaintiffs and each Class member purchased a Nest Thermostat.  As described above, the terms of the contract include the promises and affirmations of fact relating to the energy savings, cost savings, temperature accuracy and responsiveness representations on Defendant's product packaging, online, and through its marketing campaign, as described above.  Defendant's online and packaging representations became part of the basis of the bargain and are part of a contract between Plaintiffs and the members of the Class on the one hand, and Defendant on the other, and thus constituted express warranties.

102.    Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted, among other things, the following material terms about Nest Thermostats:

    a.    "[Nest Thermostats] can automatically lower air-conditioning costs up to 30%"

    b.    "Teach it well and Nest can lower your heating and cooling bills up to 20%"

    c.    "Most thermostats waste 20% of your heating and cooling bill. Nest stops the waste."

    d.    "Save energy. Make money."

    e.    "Nest thermostat's sensors are designed to be highly accurate and react to changes in the ambient temperature more readily than most thermostats."

103.    Defendant sold the goods to Plaintiffs and the other Class members, who bought the goods from Defendant.  Plaintiffs and the Class members are ordinary consumers who are not versed in the art of inspecting and judging the properties of thermostats.  Plaintiffs and the Class acted reasonably based on Defendant's temperature accuracy, cost saving, and energy saving representations.

104.    Defendant breached the terms of this contract, including the express warranties described in this Count IV as well as above, because Nest (a) does not accurately read temperature; (b) does not lower air-conditioning costs up to 30%; (c) does not lower heating and cooling bills up to 20%; (d) does not stop wasting 20% of customer's heating and cooling bills; (e) does not save energy; (f) does not "make money"; (g) and was not "designed to be highly accurate and react to changes in the ambient temperature more readily than most thermostats."  Therefore, Defendant's express warranties were false, misleading and deceptive.  As a result of this breach, Plaintiffs and the Class did not receive the goods as warranted by Defendant.

105.    Plaintiffs and Class members were injured and harmed as a direct and proximate result of Defendant's breach because: (a) they would not have purchased Nest on the same terms if the true facts were known about the purported accuracy of Nest's temperature readings, and Defendant's energy and cost savings representations; (b) they paid a price premium for Nest due to Defendant's promises described in this Count IV and above; and (c) they did not receive the promised energy-cost savings.

<u>COUNT V</u>
**Breach Of The Implied Warranty Of Merchantability**

106.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

107.    Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendant.

108.    Defendant is and was at all relevant times a "merchant" within the meaning of the Uniform Commercial Code ("UCC").  Defendant manufactured, distributed, and marketed Nest Thermostats, which are "goods" within the meaning of the UCC.  Consequently, Defendant impliedly warranted that Nest Thermostats were merchantable, including that they could pass without objection in the trade under the contract description, that they were fit for the ordinary purposes for which such goods are used, that they were of fair average quality within the description, that they were adequately labeled, and that they would conform to the promises or affirmations of fact made on their container or labels.  However, each of these implied warranties was false with respect to the goods of the kind sold to Plaintiffs and members of the Class.  Indeed, Defendant's thermostat is not fit for the ordinary purpose for which thermostats are used – measuring and controlling temperature.

109.    Plaintiffs and Class members purchased Nest Thermostats for the purpose of accurately determining and responding to ambient temperature.

110.    The Nest Thermostats were not altered by Plaintiffs or Class members.

111.    The Nest Thermostats were defective when they left the exclusive control of Defendant.

112.    Defendant knew Nest would be purchased and used by Plaintiffs and Class members without additional testing.  The Nest Thermostats were unfit for their ordinary purpose, and Plaintiffs and Class members did not receive the goods as warranted.

113.    More specifically, Defendant breached its implied warranty of merchantability to Plaintiffs and the Class because the Nest Thermostats would not pass without objection in the trade because they were incapable of performing the functions that thermostats are intended to perform.

They are not capable of precisely controlling the cooling and heating functions and are incapable of accurately determining and responding to the ambient temperature.

114. As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members were injured because (a) they would not have purchased Nest if they had known that the products were not capable of precisely controlling the heating and cooling functions, contributing to cost and energy savings and accurately determining and/or responding to the ambient temperature; (b) they paid a price premium for the Nest Thermostats based on Defendant's warranties; (c) they did not receive the promised energy-cost savings; and (d) the Nest Thermostats did not have the characteristics, uses, or benefits as promised.

## COUNT VI
### Breach Of Implied Warranty Of Fitness For A Particular Purpose

115. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

116. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

117. Defendant marketed, distributed, and/or sold Nest with implied warranties that it was fit for its particular purpose of contributing to energy and cost savings.

118. At the time of purchasing Nest, Plaintiffs and the Class members intended to use Nest to realize energy and cost savings.

119. Because Defendant extensively marketed Nest as an energy and cost saving device, Defendant knew at the time it sold Nest to Plaintiffs and the Class that the Plaintiffs and the Class intended to use Nest for that particular purpose.

120. Plaintiffs and the Class members relied on Defendant's skill and judgment to furnish goods suitable for managing "half your home's energy bill" and for energy and cost savings. Plaintiffs and Class members purchased Nest Thermostats in reliance upon Defendant's implied warranties.

121.    At the time that the Nest Thermostats were sold, Defendant knew or had reason to know that Plaintiffs and Class members were relying on Defendant's skill and judgment to select or furnish a product capable of operating as an energy and cost saving device.

122.    The Nest Thermostats were not altered by Plaintiffs or Class members.

123.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased the products on the same terms if the true facts were known concerning Nest Thermostats' design; (b) they paid a price premium for the products due to Defendant's promises that the Nest Thermostats were capable of delivering energy and cost savings; and (c) they did not receive the promised energy-cost savings.

## <u>COUNT VII</u>
### Common Law Fraud

124.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

125.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Defendant.

126.    As detailed above, Defendant affirmatively misrepresented and concealed material facts concerning the quality and attributes of Nest.

127.    Defendant had a duty to disclose the true nature of Nest and its defective condition based on its superior knowledge, as well as affirmative misrepresentations and omissions to the contrary.

128.    Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiffs and members of the Class to purchase Nest.

129.    Plaintiffs and the Class relied on Defendant's misrepresentations because, but for those misrepresentations, Plaintiffs and Class members would not have purchased Nest, or would not have purchased Nest at a premium over traditional thermostats.

130.    Plaintiffs and the Class were unaware of material information Defendant failed to disclose and would not have acted as they did if they had known of the concealed and/or suppressed facts.

131.    Further, Plaintiffs and Class members did not experience the energy and cost savings promised by Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, seek judgment against Defendant as follows:

  a. For an order certifying a nationwide Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives of the Class and Plaintiffs' attorneys as Class Counsel;

  b. For an order declaring that Defendant's conduct violates the statutes referenced herein;

  c. For an order finding in favor of Plaintiffs, and the nationwide Class on all counts asserted herein;

  d. For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

  e. For prejudgment interest on all amounts awarded;

  f. For an order of restitution and all other forms of equitable monetary relief;

  g. For injunctive relief as pleaded or as the Court may deem proper;

  h. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees, and expenses;

  i. Damages, restitution, and/or disgorgement in an amount to be determined at trial; and

  j. For such other and further relief as the Court may deem proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated:  June 24, 2014

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:  _____*/s/ Annick M. Persinger*_____
                Annick M. Persinger

Scott A. Bursor (State Bar No. 276006)
L. Timothy Fisher (State Bar No. 191626)
Annick M. Persinger (State Bar No. 272996)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Boulevard, Suite 940
Walnut Creek, CA  94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: scott@bursor.com
              ltfisher@bursor.com
              apersinger@bursor.com
              ykrivoshey@bursor.com

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**

By:  _____*/s/ Bryan L. Clobes*_____
                Bryan L. Clobes

Bryan L. Clobes
1101 Market St., Suite 2650
Philadelphia, Pennsylvania 19107
Telephone:  (215) 864-2800
Email: bclobes@caffertyclobes.com

**CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP**
Daniel O. Herrera
Christopher Sanchez
30 N. LaSalle, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Email: dherrera@caffertyclobes.com
csanchez@caffertyclobes.com

**FINKELSTEIN THOMPSON LLP**
Rosemary M. Rivas (State Bar No. 209147)
505 Montgomery Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 398-8700
Email: rrivas@finkelsteinthompson.com

*Attorneys for Plaintiffs*

1

2

## CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)

I, Justin Darisse, declare as follows:

3

4

1.    I am a plaintiff in this action. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently thereto.

5

6

7

8

2.    The complaint filed in this action is filed in the proper place because, as shown on the Nest website and elsewhere, Defendant Nest Labs, Inc. ("Nest Labs") is headquartered and has its principal place of business in this District at 900 Hansen Way, Palo Alto, California 94304. Nest Labs also conducts substantial business in this District.

9

10

11

12

13

14

15

16

17

3.    I purchased the Nest Learning Thermostat for use in my household. I purchased the product after I reviewed Nest Labs' marketing material and representations online, such as on the Nest website, including that the Nest Learning Thermostat provides energy and cost savings, as well as accurate temperature readings. I also read and relied on Nest Labs' representations found on the packaging before installing the Nest Learning Thermostat. Nest Labs' marketing of the Nest Learning Thermostat was a substantial factor influencing my decision to purchase the product. I would not have purchased the Nest Learning Thermostat had I known that the product would not provide accurate temperature readings, or energy and cost savings.

18

19

20

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, executed on March 24, 2014 at Gaithersburg, Maryland.

21

22

23

_____
JUSTIN DARISSE

24

25

26

27

28

**AFFIDAVIT OF ROSEMARY M. RIVAS**

I, Rosemary M. Rivas, declare as follows:

1.     I am a partner with the law firm Finkelstein Thompson LLP, counsel for Plaintiff Joshua Beloff in this action. I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code § 1780(c). I make this declaration based on my research of public records and also upon personal knowledge and if called upon to do so, could and would testify competently thereto.

2.     Based on my research of public records and personal knowledge, Defendant Nest Labs, Inc. has its headquarters and principal place of business located within this County, as alleged in the accompanying Class Action Complaint.

I declare under penalty of perjury under the laws of the United States and State of California this 11th day of April 2014 in San Francisco, California that the foregoing is true and correct.


/s/ Rosemary M. Rivas

**EXHIBIT A**

# BURSOR & FISHER

P.A.

1990 N. California Blvd.
SUITE 940
WALNUT CREEK, CA 94596
www.bursor.com

ANNICK M. PERSINGER
Tel: 925.300.4455
Fax: 925.407.2700
apersinger@bursor.com

February 5, 2014

*Via Certified Mail - Return Receipt Requested*

NEST LABS INTERNATIONAL, INC.
900 Hansen Way
Palo Alto, CA 94304

Re:     *Demand Letter Pursuant to California Civil Code § 1782,*
        *Violation of Magnuson-Moss Act, 15 U.S.C. §§ 2301, et seq., and other applicable laws.*

To Whom It May Concern:

This letter serves as a notice and demand for corrective action on behalf of my client, Justin Darisse, and all other persons similarly situated, arising from breaches of warranty under the Magnuson-Moss Warranty Act and violations of numerous provisions of California law including the Consumers Legal Remedies Act, Civil Code § 1770, including but not limited to subsections (a)(5), (7), and (9). This letter also serves as notice pursuant to Cal. Com. Code § 2607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the manufacture, marketing, and sale of the Nest Thermostat ("Nest"). Your conduct with respect to the promotion and marketing of Nest is false and misleading. Such conduct includes, but is not limited to, misrepresenting in advertising that Nest will "lower your heating and cooling bills up to 20%," and will "automatically lower air-conditioning costs up to 30%." Your representation that "Nest uses multiple temperature sensors to determine the ambient temperature with a high degree of accuracy" is also false and misleading because Nest's temperature reading is from two to ten degrees higher than the actual ambient temperature in the surrounding room. As a result of the defects with Nest's temperature reading, Nest purchasers received an ineffective product and do not experience the advertised energy savings.

Mr. Darisse purchased Nest Thermostat 2nd Generation based on representations on the label and in other marketing and advertising material that state that the product would accurately determine ambient temperature and would lower energy costs. His use of the Nest Thermostat has not resulted in energy savings. His Nest does not accurately determine ambient temperature. Mr. Darisse would not have purchased Nest had he known that the product is ineffective at reading temperature or providing energy savings. Mr. Darisse is acting on behalf of a class defined as all persons in the United States who purchased a Nest Thermostat (hereafter, the "Class").

By selling Nest based on affirmative representations that it accurately reads ambient temperature, and reduces energy costs, you have violated numerous provisions of California law, including but not limited to Cal. Com. Code §§ 2-313 and 2-314.

We hereby demand that you immediately make full restitution to all purchasers of Nest of all purchase money obtained from the sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1. All documents concerning the design, development and manufacture of Nest;

2. All documents concerning defects or issues with Nest related to inaccurate temperature readings;

3. All documents concerning the advertisement, marketing, or sale of Nest; and

4. All communications with customers concerning complaints or comments concerning Nest.

We are willing to negotiate to attempt to resolve the demands asserted in this letter.  If you wish to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.  If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Annick M. Persinger

**EXHIBIT B**



Cafferty Clobes
Meriwether&Sprengel LLP

Bryan L. Clobes
bclobes@caffertyclobes.com

**VIA CERTIFIED MAIL**

April 25, 2014

President/CEO
Nest Labs, Inc.
900 Hansen Way
Palo Alto, CA 94304

      **Re:**    Violation of the California Consumers Legal Remedies Act
               *California Civil Code* section 1750 *et seq.*

Dear President/CEO or other interested party of Nest Labs, Inc.:

You are hereby notified that Nest Labs, Inc. ("Nest Labs"), as the designer, researcher, manufacturer, distributor and/or marketer of the Nest Learning Thermostat ("the Product"), has violated and continues to violate provisions of the California Consumers Legal Remedies Act (California *Civil Code* section 1750, *et. seq.*, the "CLRA") with respect to the advertising and marketing of the Product. Moreover, Nest Labs' conduct violates California's Unfair Competition Law and False Advertising Law. Nest Labs has also breached the Product's warranties because, among other things, its statements and promises in advertising concerning the Product were materially misleading and inaccurate. (California *Civil Code* section 1791.1 and 1792 *et seq.*).

Your false and deceptive marketing and advertising has adversely affected Joshua Beloff ("Beloff") and hundreds of thousands of consumers (the "Plaintiff Class"). The Plaintiff Class continues to enter into transactions and expend money in reliance on the uniform false and misleading claims made in marketing and advertising for the Product. In particular, the uniform false and material representations and omissions regarding the quality, functionality and attributes of the Product caused the Plaintiff Class to pay costs for the Product greater than they would have paid had Nest Labs refrained from making these material misrepresentations and omissions.

Nest Labs, in connection with its marketing and advertising of the Product, has violated California's *Civil Code* sections 1770(a)(5), 1770(a)(7) and 1770(a)(9) by (1) representing the Product characteristics, uses, benefits and qualities that it does not have; (2) representing the Product is of a particular standard, quality and grade when it is not; and (3) advertising the Product with the intent not to sell it as advertised. Nest Labs' uniform false and misleading claims are detailed in the attached Class Action Complaint, which was filed by Mr. Beloff in the United States District Court, Northern District of California.

30 N. LaSalle St. • Suite 3200 • Chicago, IL 60602
p 312.782.4880   f 312.782.4485
www.caffertyclobes.com

Cafferty Clobes Meriwether&Sprengel<sub>LLP</sub>

President/CEO
Nest Labs, Inc.
April 25, 2014
Page Two

All of Nest Labs' claims, as set forth in the Complaint, are false and misleading. Accordingly, demand is hereby made that Nest Labs correct, repair, replace or otherwise rectify the damage endured by consumers as a result of the deceptive and unlawful conduct described above in violation of *Civil Code* section 1750 *et seq.*

## Demand for Relief

Demand is hereby made that Nest Labs agree, within 30 days of receipt of this Notice, to do and complete the following:

1. Changes to Nest Labs' Advertising and Marketing of the Products

On behalf of Beloff and the proposed Class, we demand that Nest Labs cease from expressly or impliedly misrepresenting the quality of the Product to current and potential purchasers of Nest Learning Thermostats.

2. Permanent Injunction

On behalf of Beloff and the proposed Class, we demand that Nest Labs agree and enter into a stipulated permanent injunction providing that Nest Labs will refrain from recommencing the wrongful practices identified herein.

3. Provide Notice to the Proposed Class

On behalf of Beloff and the proposed Class, we demand that Nest Labs agree to provide all members of the proposed Class as defined in the Complaint with written notice of the existence of this action and the name of Plaintiff's attorneys.

4. Restitution to the Plaintiff Class

Finally, we ask that Nest Labs offer the proposed Class full restitution. Specifically, establish a consumer fund in an amount sufficient to provide each and every class member with a full refund for each and every Product purchased during the Class Period. Of course, this would be subject to our review, as class counsel, of appropriate financial information detailing all sales made to consumers during the Class Period. We also request that Nest Labs provide for all costs, reasonable attorneys' fees and claims administration costs.

Pursuant to California *Civil Code* Section 1782(a)(2), this notice has been sent to you by certified mail, return receipt requested, to Nest Labs' principal place of business in California.

**Cafferty Clobes Meriwether&Sprengel**LLP

President/CEO
Nest Labs, Inc.
April 25, 2014
Page Three

        If you wish to discuss the above, please do not hesitate to contact me at (215) 864-2800.  If
we do not hear from you prior to the close of business May 23, 2014, we will assume that Nest Labs
has no interest in attempting to amicably resolve this matter and we will amend our Complaint to
seek damages under the CLRA.

                        Sincerely,

                        Bryan L. Clobes /doh

                        Bryan L. Clobes

BLC/doh