# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

JUSTIN DARISSE,

           Plaintiff,

      v.

NEST LABS, INC.,

           Defendant.

Case No. 5:14-cv-01363-BLF

**ORDER DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

[Re: ECF 89]

      During the dog days of summer and the deep chills of winter, people turn to thermostats to keep their homes at a livable temperature. To that end, Plaintiff Justin Darisse purchased a Nest Learning Thermostat ("NLT"), hoping that it would save him energy and money in addition to keeping him comfortable. He now sues Defendant Nest Labs, Inc. ("Nest"), alleging that the NLT did not perform as advertised, and moves to certify a nationwide class of similarly disappointed consumers. But because Darisse has not satisfied Rule 23(a)'s commonality, typicality, and adequacy requirements, or Rule 23(b)(3)'s predominance requirement, his motion is DENIED.[1]

## I.    BACKGROUND

      The NLT is a Wi-Fi-enabled thermostat that logs user behavior and preferences, and uses that data to control basic heating and cooling operations in the home. *See* Opp. at 1, ECF 111-11. The first generation of NLTs hit the market in October 2011, and the second generation came out in October 2012. *See* Oenning Decl. ¶ 6, ECF 116. NLTs are sold through several different retail channels, and retailers use a wide variety of marketing claims to sell them. *Id.* ¶¶ 2-3, 18-19. As a result, where you buy your NLT affects what promotional claims you see. *Id.* For example, putative class members who bought NLTs from Nest.com might have seen some of these claims,

---

[1] The Court does not consider whether Darisse is entitled to leave to amend, because he raises it only in a footnote in his reply brief. *See* Reply at 12 n.3, ECF 124-4.

which appeared on Nest's website at various times during the class period:

- "The EPA says a properly programmed thermostat can cut 20% off your heating and cooling bill." Oenning Decl. Ex. G at 1, ECF 116-2.
- "Teach [the NLT] well and the Nest Thermostat can lower your heating and cooling bills up to 20%." Oenning Decl. Ex. I at 1, ECF 116-3.
- "12 [MONTHS IN USE] = $173 [DOLLARS IN SAVINGS]" Oenning Decl. Ex. K at 4-5, ECF 116-4; Oenning Decl. Ex. O at 4, ECF 116-5. (This representation was followed by a disclaimer stating that "results will vary depending on local climate, energy rates, home size and your home's insulation." *Id.*)
- "If your thermostat isn't programmed, you could be wasting around $173 a year. . . . A correctly programmed thermostat can save about 20% on your heating and cooling bill." Oenning Decl. Ex. N at 1, ECF 116-5.

Like the marketing claims on Nest's website, the marketing claims on the NLT's product packaging also varied over time. The first generation NLT's product packaging did not make any claims about energy savings of up to 20% or $173/year. *See* Oenning Decl. ¶¶ 6-7, ECF 116; *Id.* at Ex. B, ECF 116-1; *id.* at Ex. C, ECF 116-1; *id.* at Ex. D, ECF 116-2. In contrast, some versions of the second generation NLT's product packaging—there were at least four—did make claims about energy savings. *See id.* ¶ 8, ECF 116. The exact language varied over time, but at one point, the packaging read, "Most thermostats waste 20% of your heating and cooling bill. Nest stops the waste." Oenning Decl. ¶ 8, ECF 116; Oenning Decl. Ex. F at 3, ECF 116-2.

Darisse bought a second generation NLT in fall 2013. *See* Amended Complaint ¶ 9, ECF 28; Darisse Decl. ¶ 4, ECF 88-17. He purchased his NLT from Amazon.com, using his spouse's Amazon Prime account. *See* Reply at 12, ECF 124-4. He states that he bought his NLT "based on statements on the Nest website that '[A] correctly programmed thermostat can save about 20% on your heating and cooling bill,' that [he] could save $173 a year on average on energy, and that 'Nest saves energy. Automatically.'" Darisse Decl. ¶ 4, ECF 88-17. He "reviewed the same statements on Amazon.com" before buying the NLT. *Id.*

Darisse now argues that Nest's cost and energy savings estimates are flawed and the NLT

2

does not live up to its promises of saving up to 20% on heating and cooling bills, or $173 annually. *See* Mot. at 3-9, ECF 88-16. Darisse provided his energy bills for May to October 2013, the five months before he bought his NLT, and the parties compared those bills with his energy bills for May to October 2014 and May to October 2015. The comparison showed that in 2014, Darisse's monthly energy savings post-NLT installation fluctuated between 4.7% and 22.2%, but in 2015, his monthly energy savings topped out at 9.0%. *See* Blasnik Decl. ¶ 11, ECF 111-14; Weir Reply Decl. ¶¶ 69-72, ECF 124-10.

| Billing Cycle Ending | % Energy Savings 2014 v. 2013 | % Energy savings 2015 v. 2013 |
|---|---|---|
| June | 16.2% | 9.0% |
| July | 4.7% | 3.6% |
| August | 22.2% | 6.0% |
| September | 20.2% | 6.4% |
| October | 21.7% | 8.0% |

*See* Blasnik Decl. ¶11, ECF 111-14; Weir Reply Decl. ¶ 71, ECF 124-10. Darisse says that he would not have bought his NLT if he had known that Nest's representations about a 20% or $173 savings were "inaccurate and misleading." Darisse Decl. ¶ 5, ECF 88-17.

In March 2014, less than half a year after buying his NLT, Darisse sued Nest on behalf of himself and others similarly situated, raising claims for (1) violation of Cal. Civ. Code §§ 1750 et seq., California's Consumer Legal Remedies Act ("CLRA"); (2) violation of Cal. Bus. & Prof. Code §§ 17200 et seq., California's Unfair Competition Law ("UCL"); (3) violation of Cal. Bus. & Prof. Code §§ 17500 et seq., California's False Advertising Law ("FAL"); (4) breach of express warranty; (5) breach of the implied warranty of merchantability; (6) breach of implied warranty of fitness for a particular purpose; and (7) common law fraud. *See* Consolidated Compl. ¶¶ 68-131. He seeks declaratory relief, injunctive relief, and damages. *See id.* at 39. He now moves under Rule 23(b)(3) and asks the Court to certify a nationwide class defined as

> All persons who purchased a Nest First Generation or Second Generation Thermostat ("Nest") from November 1, 2011 to February 1, 2015.

Mot. at 1, ECF 88-16. Nest opposes Darisse's motion and argues that Darisse lacks standing, that differences in state laws prevent certifying a nationwide class under Rule 23(b)(3), and that

United States District Court
Northern District of California

1  Darisse has not satisfied Rule 23(a)'s commonality, adequacy, and typicality requirements.  The

2  Court finds that Darisse has standing, but DENIES Darisse's motion because he has not satisfied

3  Rule 23(a) and 23(b)(3).

4  **II.  STANDING**

5      **A.  Legal Standard**

6        Ordinarily, questions of standing are raised by way of a motion to dismiss for lack of

7  subject matter jurisdiction.  *See, e.g., Perez v. Nidek Co.*, 711 F.3d 1109, 1113-14 (9th Cir. 2013);

8  *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1014-15 (9th Cir. 2010); *see also Lujan v. Defenders of*

9  *Wildlife*, 504 U.S. 555, 561 (1992).  Here, rather than filing any Rule 12 motion, Nest simply

10  answered.  *See* Docket No. 33.  But a court is always obligated to consider whether any plaintiff

11  has standing to pursue the relief sought.  "Standing is a threshold matter central to our subject

12  matter jurisdiction.  We must assure ourselves that the constitutional standing requirements are

13  satisfied before proceeding to the merits." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985

14  (9th Cir. 2007) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995)); *Casey v. Lewis*, 4 F.3d

15  1516, 1524 (9th Cir. 1993)).  The Court thus must consider Darisse's standing to pursue his

16  proposed class-wide declaratory, injunctive, and damages relief before anything else.  *See Ellis v.*

17  *Costco Wholesale Corp.*, 657 F.3d 970, 978 (9th Cir. 2011) ("In a class action, the plaintiff class

18  bears the burden of showing that Article III standing exists."); *In re Abbott Labs. Norvir Anti-*

19  *Trust Litig.,* Case No. 04-cv-1511-CW, 2007 WL 1689899, at *2 (N.D. Cal. June 11, 2007)

20  (quoting *Wooden v. Bd. of Regents of Univ. Sys. of Georgia,* 247 F.3d 1262, 1287–88 (11th Cir.

21  2001)) ("[P]rior to the certification of a class, and technically speaking before undertaking any

22  formal typicality or commonality review, the district court must determine that at least one named

23  class representative has Article III standing to raise each class subclaim.").

24        "In a class action, standing is satisfied if at least one named plaintiff meets the

25  requirements." *Bates*, 511 F.3d at 985.  Article III standing requires a plaintiff show "(1) an

26  injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) that the injury

27  is fairly traceable to the challenged action of the defendant; and (3) that the injury is redressable

28  by a favorable ruling." *Kane v. Chobani, Inc.*, 973 F. Supp. 2d 1120, 1128 (N.D. Cal.

United States District Court
Northern District of California

2014) (citing *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)). The plaintiff "bears the burden of showing that he has standing for each type of relief sought," and so a plaintiff seeking equitable relief such as an injunction must further demonstrate a likelihood of future injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see also Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618, 626 (N.D. Cal. 2011) (citing *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1039 (9th Cir. 1999); *see also Clark v. City of Lakewood*, 259 F.3d 996, 1006-07 (9th Cir. 2001), *as amended* (Aug. 15, 2001) (citing *Friends of the Earth Inc. v. Laidlaw Env. Servs. (TOC), Inc.*, 528 U.S. 167, 191-91 (2000); *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983)). This requires a showing that the plaintiff is "realistically threatened by a repetition of the violation." *Gest v. Bradbury*, 443 F.3d 1177, 1181 (9th Cir. 2006) (quoting *Armstrong*, 275 F.3d at 860-61). Allegations that a defendant's continuing conduct subjects unnamed class members to the alleged harm are insufficient if the named plaintiffs are themselves unable to demonstrate a likelihood of future injury. *See Hodgers-Durgin*, 199 F.3d at 1044-45; *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1114 (2013).

## B. Discussion

Darisse has satisfied the injury requirement for each type of relief he seeks, except for injunctive relief.[2] At this stage, allegations alone are not enough. Because the elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. On a motion for class certification, this means a plaintiff must show standing "through evidentiary proof," which is the standard on a Rule 23(b) motion. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *see also Evans v. Linden Research, Inc.*, Case No. 11-cv-1078-DMR, 2012 WL 5877579, at *6 (N. D. Cal. Nov. 20,

---

[2] As a side note, Nest argues that Darisse lacks standing because he did not purchase his NLT. *See* Opp. at 12, ECF 124-4. During his deposition, however, Darisse testified that his wife purchased the NLT on her Amazon Prime account to get discounted shipping, but that he was "the one who asked her to buy it," and the purchase was at "[his] suggestion and direction." Darisse Reply Decl. ¶ 5, ECF 124-6; Darisse Reply Decl. Ex. D at 47:3-5, 76:2-3, ECF 124-6. This is sufficient for the Court to proceed with the *Lujan* analysis.

United States District Court
Northern District of California

2012) (holding that at class certification, "Plaintiffs must demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III standing to bring the claims asserted on behalf of the [class].").

Darisse has provided evidentiary proof of injury with his energy bills for May-October 2013, before he installed his NLT, and his energy bills for May-October 2014 and May-October 2015, after he installed his NLT. These bills show that for at least seven of the ten months for which the parties have analyzed Darisse's energy usage, Darisse did not save up to 20% in energy usage. *See* Blasnik Decl. ¶11, ECF 111-14; Weir Reply Decl. ¶ 71, ECF 124-10. During three of the ten billing cycles in May-October 2014, Darisse saved more than 20% in energy use: in the August 2014 billing cycle, he saved 22.2% over the previous year, in the September 2014 billing cycle he saved 20.2%, and in the October 2014 billing cycle, he saved 21.7%. *See* Blasnik Decl. ¶ 11, ECF 111-14. But in the other seven billing cycles, Darisse's energy savings were nowhere near 20%, ranging from a paltry 3.6% (July 2015) to 16.2% (June 2014). *See* Blasnik Decl. ¶11, ECF 111-14; Weir Reply Decl. ¶ 71, ECF 124-10.

Darisse claims that he bought the NLT in reliance on its marketing claims that he would save up to 20% in energy or $173 annually. The words "up to 20%," plainly interpreted, are not a guarantee of saving 20% in every billing cycle. Rather, they mean that an NLT is capable of saving its user as much as 20% in energy, but it may not always do so. They do suggest, however, that the NLT is capable of approaching a 20% energy savings on a regular basis, and Darisse's energy bills show that his NLT did not provide a consistent savings approaching 20%.[3] This is an injury traceable to Nest's marketing claims and establishes standing for Darisse's claims for compensatory and punitive damages, restitution, equitable monetary relief, attorney's fees, and

---

[3] Darisse argues that he has standing because Nest's internal studies found that the NLT saves an average of 10-12% on heating and 15% on cooling, not the 20% that Nest claimed in its marketing materials. *See* Reply at 12, ECF 124-4. According to Darisse, those studies are "representative evidence of injury" and are "sufficient to find that [he] has suffered an injury." *Id.* Leaving aside the question of whether an *average* savings of 10-15% is proof that the NLT does not save *up to* 20%, Darisse's argument is unsuccessful since standing in a class action requires Darisse himself, as the sole named plaintiff, to demonstrate injury. *Bates*, 511 F.3d at 985. Darisse has shown evidentiary proof of injury and so has standing—but it is not because Nest's internal studies can be used to assume he personally suffered an injury.

1   damages.

2       Darisse does not have standing for injunctive relief, however, because he has not shown a

3   likelihood of future injury.  First, Nest no longer uses the 20% savings figure.  *See* Mot. at 8-9,

4   ECF 88-16.  Second, Darisse testified at his deposition that after his experience with the NLT, he

5   no longer believes energy savings statements about thermostats and is "not going to trust what –

6   what a company says now."  Darisse Depo. at 97:67-17, 98:10-14, Wilson Decl. Ex. 217, ECF

7   113-4.  Third, Darisse no longer uses his NLT, and replaced it with an Ecobee 3 because he was

8   annoyed at "seeing the [NLT] on the wall" and wanted a new thermostat that he could program

9   remotely.  *Id.* at 97:2-11.

10  **III.    RULE 23(a)**

11      Class certification requires satisfying both Rule 23(a)'s numerosity, commonality,

12  typicality, and adequacy requirements and at least one of the provisions of Rule 23(b).  *See Mazza*

13  *v. Am. Honda Motor Co., Inc.*, 666 F. 3d 581, 588 (9th Cir. 2012).  Darisse moves to certify his

14  class under Rule 23(b)(3).  *See* Mot. at 1, ECF 88-16.  The Court first considers whether Darisse

15  has satisfied Rule 23(a), and then turns to his arguments under Rule 23(b)(3).

16      Under Rule 23(a)'s threshold requirements, class certification is appropriate only if

17      (1) the class is so numerous that joinder of all members is impracticable;

18      (2) there are questions of law or fact common to the class;

19      (3) the claims or defenses of the representative parties are typical of the claims or
        defenses of the class; and

20

21      (4) the representative parties will fairly and adequately protect the interests of the
        class.

22      Fed. R. Civ. P. 23(a).

23  Numerosity is satisfied, but Nest argues that commonality, typicality, and adequacy are not.  The

24  Court finds that commonality, typicality, and adequacy are not satisfied, making class certification

25  inappropriate.

26      **A.   Commonality**

27      "[C]ommonality requires that the class members' claims depend upon a common

28  contention such that determination of its truth or falsity will resolve an issue that is central to the

7

1   validity of each claim in one stroke." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir.

2   2014) (citations and internal quotation marks omitted).  In other words, "the key inquiry is not

3   whether the plaintiffs have raised common questions, 'even in droves,' but rather whether class

4   treatment will 'generate common *answers* apt to drive the resolution of the litigation.'" *Abdullah*

5   *v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Dukes*, 131 S. Ct. at 2551)

6   (emphasis in original).  However, not every question of law or fact must be common to the class;

7   "all that Rule 23(a)(2) requires is a single *significant* question of law or fact." *Id.* (internal citations

8   omitted) (emphasis in original).

9          There are two obstacles to finding that there is a significant question of law or fact

10   common to the class.  First, a swathe of putative class members is excluded from this class action.

11   Nest's Sales Terms govern the purchases of class members that bought their NLTs directly from

12   Nest.com, and one of those terms is an arbitration clause.  *See* Sales Terms at 1, § 11(a), Oenning

13   Decl. Ex. A, ECF 116.  Any "claim, dispute, action, cause of action, issue, or request for relief

14   arising out of or relating to" the Sales Terms or the purchaser's use of the NLT is subject to

15   binding arbitration.  *Id.*  Another term is a class action waiver.  *Id.* at § 11(d).  There cannot be

16   common questions of law or fact with respect to potential class members who are bound by the

17   arbitration clause and class action waiver and are excluded from this lawsuit.

18          The second obstacle to commonality is reliance.  Darisse is entitled to a classwide

19   inference of reliance only if he can show "(1) that uniform misrepresentations were made to the

20   class, and (2) that those misrepresentations were material." *In re ConAgra Foods, Inc.*, 302

21   F.R.D. 537, 571 (C.D. Cal. 2014).  "An inference of classwide reliance cannot be made where

22   there is no evidence that the allegedly false representations were uniformly made to all members

23   of the proposed class." *Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 125

24   (2011), *as modified* (Nov. 22, 2011).

25          Darisse argues that Nest's representation that the NLT saves 20% was ubiquitous, that

26   Nest used it "consistently . . . in some way, shape, or form," and that class members thus were

27   exposed to the 20% representation at the point of sale, whether the point of sale was Nest.com,

28   third party e-commerce sites, or a brick and mortar store where the representation was visible on a

pull card or the NLT's packaging. *See* Reply at 1-2, ECF 124-4. His argument is unconvincing, however. First of all, the packaging on the first generation NLT did not make any claims about energy savings of up to 20% or $173/year. *See* Oenning Decl. ¶¶ 6-7, ECF 116; *Id.* at Ex. B, ECF 116-1; *id.* at Ex. C, ECF 116-1; *id.* at Ex. D, ECF 116-2. Class members that bought the first generation NLT in a brick and mortar store thus may not have been exposed to the 20% or $173 savings claims. Second, Darisse attempts to extrapolate too much from Nest's statements during discovery. It is true that during a deposition, Anton Oenning, Nest's head of brand strategy, testified that Nest's website consistently used the 20% figure "in some way, shape or form." Oenning Depo. at 113:23-25, Persinger Reply Decl. Ex. A, ECF 124-8. But the "way, shape or form" of the use is crucial, because some of the representations on Nest.com did not refer to the NLT at all:

- "The EPA says a properly programmed thermostat can cut 20% off your heating and cooling bill." Oenning Decl. Ex. G at 1, ECF 116-2.

- "If your thermostat isn't programmed, you could be wasting around $173 a year. . . . A correctly programmed thermostat can save about 20% on your heating and cooling bill." Oenning Decl. Ex. N at 1, ECF 116-5.

Both of those representations use the 20% figure, but neither refers to the NLT or promises that the NLT can save 20%. Nor is either representation a misrepresentation: in July 2003, the EPA published a paper stating that Energy Star programmable thermostats were estimated to have energy savings of 20% over standard new products. *See* Wilson Ex. 208 at 5, ECF 111-7.

Another representation on Nest.com conditioned the potential savings on teaching the NLT well:

- "Teach [the NLT] well and the Nest Thermostat can lower your heating and cooling bills up to 20%." Oenning Decl. Ex. I at 1, ECF 116-3.

A fourth representation on Nest.com mentioned the $173 savings figure, but had an explicit disclaimer:

- "12 [MONTHS IN USE] = $173 [DOLLARS IN SAVINGS]" Oenning Decl. Ex. K at 4-5, ECF 116-4; Oenning Decl. Ex. O at 4, ECF 116-5. (This representation was

1     followed by a disclaimer stating that "results will vary depending on local climate,

2     energy rates, home size and your home's insulation." *Id.*)

3         The 20% claims did not appear on any of Nest's television or radio ads and were not used

4     in many of its print ads. *See* Oenning Decl. ¶¶ 17-18, ECF 116.  Nest gave messaging documents

5     to third party retailers because Nest wanted to control its brand, but given that the representations

6     on Nest's own website varied during the class period, it is likely that the representations on third

7     party retailers' sites also varied over time. *See* Oenning Depo. at 93:12-94:21, Persinger Reply

8     Decl. Ex. A, ECF 124-8.

9         The savings representations that potential class members might have seen on Nest.com, the

10     second generation NLT's product packaging, or on third party retailer sites during the class period

11     varied tremendously.  Some said that the NLT could save up to 20%, if it was taught well; some

12     referred to programmable thermostats in general, and not specifically the NLT; and some did not

13     mention the 20% figure at all.  The representations were not uniform, and not all of them were

14     misrepresentations.  As a result, there can be no classwide inference of reliance.  This is not

15     *Tobacco II*, where a "'decades-long' tobacco advertising campaign" created "little doubt that

16     almost every class member had been exposed to defendants' misleading statements." *Mazza*, 666

17     F.3d at 596 (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009)).  Instead, it is closer to

18     *Mazza*, which held that a presumption of reliance did not arise from an advertising campaign that

19     included alleged misrepresentations in product brochures, a TV ad, magazines, in-store kiosks,

20     Honda's webite, periodicals, and the product owner's manual. *Mazza*, 666 F.3d at 586-87, 595.

21     **B. Typicality**

22         To satisfy Rule 23(a)'s typicality requirement, Darisse's claims must be typical of those

23     advanced by the class. Fed. R. Civ. P. 23(a)(3).  Typicality is "directed to ensuring that plaintiffs

24     are proper parties to proceed with the suit." *Reis v. Arizona Beverages USA*, 287 F.R.D. 523, 539

25     (N.D. Cal. 2012).  "The test of typicality is whether other members have the same or similar

26     injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

27     whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar*

28     *Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation and internal quotation

1    marks omitted).  The standard is permissive and asks only whether the claims of the class

2    representatives are "reasonably co-extensive with those of absent class members; they need not be

3    substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

4          Nest has unique defenses against Darisse that make him atypical.  The first is that during at

5    least three months in 2014, he saved more than 20%.  *See supra* at 3.  The second is that there is so

6    little data regarding Darisse's NLT use prior to this lawsuit.  He purchased his NLT on October

7    31, 2013, and used it for only five months before filing this lawsuit on March 25, 2014.  *See* Fisher

8    Depo. at Ex. 52 (DARISSE000019), Wilson Decl. Ex. 218, ECF 113-4; Compl., ECF 1.  The

9    absence of data on how his NLT performed prior to this lawsuit raises questions about whether

10   Darisse may have manipulated his NLT's settings or his use of it after he filed this case, to create

11   the impression that his NLT's energy-saving capabilities were worse than they actually were.

12   Darisse provided only his May-October 2013 energy bills for the parties to analyze how his NLT

13   performed.  The NLT's savings in May-October 2015—a year into this lawsuit—are so much

14   lower than the NLT's savings in May-October 2014—the period immediately after Darisse started

15   this case—that Nest could argue that Darisse unfairly altered his NLT usage.  Indeed, Darisse

16   disabled Auto-Away, an energy-saving feature, in May 2014, "roughly 6 months after

17   installation"—and two months after he brought this lawsuit.  *See* Blasnik Decl. ¶ 17, ECF 111-14.

18   This defense is one that is unique to Darisse.

19         The third reason that Darisse is atypical is that he did not use several of the NLT's energy-

20   saving features.  He disabled Auto-Away, which allows the NLT to detect when no one is home

21   and automatically adjust to a more efficient temperature.  *See id.*  He did not use Manual Away,

22   either, to set his NLT into the more energy-efficient Away mode when he was out of the house.

23   *See id.*  This is unusual behavior—during May 2014 onward, "     ▇     of the thermostats used Auto-

24   Away,    ▇    used Manual-Away and just    ▇    used neither.  In other words, very few NLT users

25   are like Darisse and do not use any away mode at all." *Id.*  Darisse also set his NLT to a less

26   efficient cooling set point than    ▇    of NLT users in his zip code.  *See id.* ¶ 18.  Although some of

27   Nest's advertising conditioned the 20% savings figure on teaching the NLT well, Darisse did not

28   teach his NLT an efficient schedule.  He did not "set back his temperature as much as most NLT

United States District Court
Northern District of California

1   users in his zip code at any time of year," even though setting back "when users are asleep or away

2   from the home is one of the most effective ways to reduce energy consumption in the home." *Id.* ¶

3   19.

4        Darisse argues that he is typical because he used the NLT's basic features and did not

5   disable any of the energy saving features. *See* Reply at 13, ECF 124-4; Darisse Reply Decl. ¶ 8,

6   ECF 124-6. But his statements are belied by Nest's data. He also argues that ███ of NLT users

7   disable Auto-Schedule, ███ disable Auto-Away, and ███ of the "longest-term customers"

8   disable Auto-Learning, but these numbers show that the vast majority of NLT users do not disable

9   any of those features, and he does not present evidence on how many NLT users disable *all* of

10   those features, as he did. *See* Reply at 13, ECF 124-4; Persinger Reply Decl. Ex. L, ECF 124-8.

11   **C. Adequacy**

12        Adequacy, meanwhile, requires Darisse to "fairly and adequately protect the interests of

13   the class." Fed. R. Civ. P. 23(a)(4). The adequacy determination requires the Court to make two

14   determinations: (1) whether the named plaintiffs and their counsel have any conflicts of interest

15   with other class members and (2) whether the named plaintiffs and their counsel will "prosecute

16   the action vigorously on behalf of the class[.]'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

17   985 (9th Cir. 2011) (citation omitted). "Adequate representation depends on, among other factors,

18   an absence of antagonism between representatives and absentees, and a sharing of interest between

19   representatives and absentees." *Id.* (citation omitted).

20        Whether Darisse can fairly and adequately protect the interests of the class when his claims

21   are not typical of those advanced by the class is doubtful. The weaknesses of his particular case

22   and the unique defenses that Nest can raise against him call into question whether he is capable of

23   prosecuting this action vigorously on behalf of the class. Nest argues that neither Darisse nor his

24   counsel is adequate for this case, because they are brothers-in-law. *See* Opp. at 22-24, ECF 111-

25   11. On its own, Nest's argument would not be persuasive, but when it is added to the other

26   difficulties Darisse brings to the table, the Court must find that Darisse is not an adequate

27   representative.

28   **IV.     RULE 23(b)(3)**

United States District Court
Northern District of California

Apart from the commonality, typicality, and adequacy issues under Rule 23(a), Darisse's proposed class also fails to meet Rule 23(b)(3)'s predominance requirement.  Rule 23(b)(3) requires Darisse to establish that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) a class action would be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance inquiry tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation.  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Darisse seeks to certify a nationwide class under California law, and so the key issue in the predominance inquiry is whether California law will govern the entire class, or whether each state's laws will govern the claims of its own residents.  Where the applicable law in a case derives from the law of numerous states, as opposed to just one state, differences in state law will "compound the disparities" among class members from different states.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001).

Darisse argues that California law should apply to the entire class.  His first argument is that a choice of law clause in Nest's End User License Agreement ("EULA") supersedes California's choice of law rules, and his second is that California's choice of law test is satisfied.  *See* Reply at 9-12, ECF 124-4.  Nest disagrees with both these arguments.  *See* Opp. at 6-15, ECF 111-11.  So does the Court.

**A.  Nest's EULA**

Nest's EULA is a one-way, post-purchase software license from Nest to users.  Section 13 of the EULA states that the "EULA, and any claim, dispute or controversy relating to this EULA, will be governed by the laws of California."  EULA § 13, Pl.'s Ex. 113, ECF 88-28.  The EULA is limited in its scope, however, and does not cover all disputes about the NLT: the first paragraph specifically states that the EULA does not cover "purchase of the Product (excluding the Product Software)," which "is governed by the Nest Labs limited warranty."  *Id.* at preamble.  Instead, the EULA merely grants a "limited and nonexclusive license . . . to execute one (1) copy of the Product Software," which is the software embedded in the NLT.  *Id.* at § 1.  As a result, neither the

EULA nor its choice of law clause applies to this lawsuit, because Darisse's claims arise out of his purchase of his NLT. *See* Consolidated Compl. ¶¶ 5, 9, 75-76, 85-87, 97, 101, 105, 109, 114, 120, 123, 129, ECF 28 (alleging Darisse purchased the NLT in reliance on Nest's representations and would not have purchased the NLT otherwise). In his Consolidated Complaint, he makes no allegations about the software in the NLT.

Darisse argues that the EULA applies to this case because the EULA covers the NLT's software, which affects users' energy savings. *See* Reply at 10-11, ECF 124-4. He points to Section 8(b) of the EULA, which mentions "ENERGY USE" and states that Nest does not represent that "USE OF THE . . . PRODUCT SOFTWARE . . . WILL DECREASE THE ENERGY CONSUMPTION OF YOUR HOME." *Id.* (quoting EULA § 8(b), Pl.'s Ex. 113, ECF 88-28). Darisse's arguments are unpersuasive: while the NLT's software may affect users' energy savings, he makes no allegations or claims about the software. He does not allege, for example, that his NLT's software malfunctioned. His claims are that Nest's advertising was false and misleading and that he purchased the NLT as a result of that advertising, and so his claims arise out of Nest's advertising and his purchase, which is governed by the Nest Labs limited warranty and not the EULA. Section 8(b) of the EULA does mention "ENERGY USE," but Darisse takes that phrase out of context: the sentence states, "THE SITE SERVICES PROVIDE YOU INFORMATION . . . REGARDING YOUR ENERGY USE . . . ." This has nothing to do with Darisse's claims. Neither does Section 8(b)'s statement that Nest does not warrant that use of the NLT's software will decrease energy consumption: merely mentioning "energy use" or "energy consumption" does not override the EULA's explicit disclaimer of disputes arising out of a user's purchase of the NLT. The EULA and its choice of law clause do not govern this case.

**B. California's Choice of Law Test**

Because the EULA's choice of law clause does not apply, the Court must use California's choice of law rules to determine whether California law can govern the entire, nationwide class, or if each state's laws must govern the claims of its own citizens.

To determine the applicable law, a "federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser*, 253 F.3d at 1187.

14

"Under California's choice of law rules, the class action proponent bears the initial burden to show that California has significant contact or significant aggregation of contacts to the claims of each class member." *Wash. Mut. Bank v. Superior Court*, 24 Cal.4th 906, 921 (2001) (internal quotation marks omitted). If contacts are sufficient, the burden then shifts to the opposing party to demonstrate that foreign law, rather than California law, should apply to the class claims. *Id.* California law may only be used on a class-wide basis if "the interests of other states are not found to outweigh California's interest in having its law applied." *Id.* To determine whether those interests outweigh California's interest, the Court must apply a three-step governmental interest test:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

> Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.

> Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

*Mazza*, 666 F.3d at 590 (quoting *McCann v. Foster Wheeler, LLC*, 48 Cal. 4th 68, 81-82 (2010)).

### 1. Conflict of Laws

Darisse has brought seven claims. *See* Amended Compl. ¶¶ 68-131. They can be broadly categorized as claims under California's consumer protection statutes (the UCL, FAL, and CLRA claims), a claim for breach of express warranty, claims for breach of implied warranties (the implied warranties of merchantability and fitness for a particular purpose), and a claim for common law fraud. *See id.* Darisse seeks to certify a nationwide class and NLTs are sold in all 50 states. *See* Pl.'s Ex. 5 at NEST-00089668.R ("50 Number of states in the U.S. where Nest is installed"). The Court thus must determine whether each of the 50 states' consumer protection statutes, express warranty, implied warranty, and common law fraud laws differ. They do.

#### a. Consumer Protection Statutes

1     As recognized in *Mazza*, the other 49 states' consumer protection statutes differ

2  significantly from California's UCL, FAL, and CLRA. 666 F.3d at 591. For example, California

3  allows class actions. *See* Cal. Civ. Code § 1780; Cal. Bus. & Prof. Code §§ 17203, 17535.

4  Georgia, Louisiana, Mississippi, Montana, South Carolina, and Virginia do not. *See* Ga. Code

5  Ann. § 10-1-399(a); La. Rev. Stat. § 51:1409(A); Miss. Code § 75-24-15(4); Mont. Code Ann. §

6  30-14- 133(1); S.C. Code § 39-5- 140(a); Va. Code §§ 59.1- 204(A-B). Alabama allows class

7  actions only if they are brought by the attorney general, and Iowa requires class actions to be pre-

8  approved by the attorney general. *See* Ala. Code § 8-19-10(f); Iowa Code § 714H.7. Kansas

9  allows class actions, but only for declaratory and injunctive relief, not damages. *See* Kan. Stat. §

10  50-634(c).

11     The 50 states' consumer protection statutes also differ with respect to the statutes of

12  limitations; reliance requirement; what constitutes actionable conduct; and the available remedies.

13  California has a three-year statute of limitations for CLRA claims and a four-year statute of

14  limitations for UCL claims. *See* Cal. Civ. Code § 1783; Cal. Bus. & Prof. Code § 17208. The

15  relevant statutes of limitations in other jurisdictions range from one year (Oregon, Alabama,

16  Arizona) to six years (New Jersey, Pennsylvania). *See* ORS 646.638(6); Ala. Code § 8-19-14 (one

17  year from discovery or four years from date of transaction); Ariz. Rev. Stat. § 12-541(5); N.J. Stat.

18  Ann. § 2A:14-1; *Lesoon v. Metropolitan Life Ins. Co.*, 898 A.2d 620, 627 (Pa. Super.), *allocatur*

19  *denied*, 912 A.2d 1293 (Pa. 2006); *Gabriel v. O'Hara*, 534 A.2d 488, 496 (Pa. Super. 1987).

20     In terms of reliance, CLRA, UCL and FAL claims require reliance. *See* Cal. Civ. Code §

21  1780(a); *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (class representatives must establish

22  reliance under the UCL and FAL to have standing); *Pfizer v. Superior Court*, 182 Cal. App. 4th.

23  622, 631- 32 (2010) (under the UCL and FAL, members of a putative class are not entitled to

24  restitutionary relief where they were never exposed to the defendant's alleged misrepresentations).

25  Delaware, Florida, Iowa, Massachusetts, New York, and Connecticut do not. *See Stephenson v.*

26  *Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del. 1983*); Davis v. Powertel, Inc.*, 776 So. 2d 971, 973-

27  74 (Fla. Dist. Ct. App. 2000); Iowa Code § 714.16(7*); Sebago, Inc. v. Beazer E., Inc.*, 18 F. Supp.

28  2d 70, 103 (D. Mass. 1998); *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611-12 (N.Y. 2000*);*

United States District Court
Northern District of California

16

1    *Izzarelli v. R.J. Reynolds Tobacco Co.*, 117 F. Supp. 2d 167, 176 (D. Conn. 2000).

2         Regarding actionable conduct, California's CLRA makes unfair and deceptive practices

3    actionable. *See* Cal. Civ. Code § 1770.  In Georgia, Kansas, and South Dakota, only deceptive

4    practices are actionable, while in Florida and South Carolina, unconscionable or unfair practices

5    are actionable. *See* Ga. Code Ann. § 10-1-372; Kan Stat. Ann. § 50- 626(a); S.D. Codified Laws §

6    37-24-6; Fla. Stat. Ann. § 501.204(1); S.C. Code Ann. § 39-5-20(a).

7         As for relief, the UCL and FAL allow restitution and injunctive relief, and CLRA provides

8    for damages, injunctive relief, punitive damages, and attorney's fees. *See* Cal. Bus. & Prof. Code

9    §§ 17203, 17535; Cal. Civ. Code § 1780(a)-(d).  Arkansas restricts punitive damages to elderly

10   and disabled persons, while Maryland, New Hampshire, New Jersey, and Tennessee bar it

11   altogether. *See* Ark. Code §§ 4-88-113(a)(1) & (f), 4-88-204; Md. Com. Law Code § 13-408(a);

12   N.H. Rev. Stat. §§ 358-A:10a, 507:16; N.J. Stat. § 56:8-19(a); *Paty v. Herb Adcox Chevrolet Co.*,

13   756 S.W.2d 697, 699 (Tenn. Ct. App. 1988).  Maryland also bars injunctive relief, and Illinois,

14   Indiana, and Louisiana restrict its availability so that it is unavailable in lawsuits brought by a

15   private individual, such as this one. *See* Md. Com. Law Code § 13-408(a); 815 Ill. Comp. Stat.

16   505/7; Ind. Code § 24-5-0.5-4(c); La. Rev. Stat. § 51:1407(A).  Ten states (Colorado, Delaware,

17   North Carolina, Massachusetts, Michigan, Minnesota, North Dakota, Ohio, Arizona, and South

18   Dakota) prohibit, restrict, or do not provide for attorney's fees. *See* Colo. Rev. Stat. Ann. § 6-1-

19   113(2)(b); Del. Code Ann. tit. 6 § 2533(b); N.C. Gen. Stat. Ann. § 75- 16.1; Mass. Gen. Laws

20   Ann. ch. 93A, § 9(4); Mich. Comp. Laws § 445.911(2); Minn. Stat. Ann. § 325D.45; N.D. Cent.

21   Code § 51-15-09; Ohio Rev. Code Ann. § 4165.03(B); Ariz. Rev. Stat. Ann. § 44-1528; S.D.

22   Codified Laws § 37-24-31.

23        Darisse claims that Nest "fails to examine how many of the purported differences in state

24   law 'are material *in this litigation*,'" but the materiality of these differences is obvious: Darisse

25   seeks to bring a nationwide class action covering claims dating back to Nov. 1, 2011, and requests

26   compensatory and punitive damages, restitution, equitable monetary relief, attorney's fees, and

*United States District Court*
*Northern District of California*

17

1    damages.[4]  Reply at 11, ECF 124-4 (quoting *Forcellati v. Hyland's, Inc.*, Case No. CV 12-1983-

2    GHK MRWX, 2014 WL 1410264, at *2 (C.D. Cal. Apr. 9, 2014)); Mot. at i, ECF 88-16;

3    Consolidated Compl. at Prayer for Relief, ECF 28.  But if this nationwide class were certified

4    under California law, that would allow class members in Alabama, Iowa, Georgia, Louisiana,

5    Mississippi, Montana, South Carolina, and Virginia to participate in the class action even though

6    the laws of their own states either prohibit class actions or bar them when not pre-approved or

7    brought by the state's attorney general.  Class members in Oregon, Alabama, and Arizona would

8    be allowed to recover for claims that would be barred by the one-year statute of limitations in their

9    home states.  The relief Darisse seeks, such as punitive damages, is unavailable or restricted in

10   Arkansas, New Hampshire, New Jersey, Tennessee, and his home state of Maryland.  These

11   differences in the states' laws plainly are material.

12                                      **b.  Express Warranty**

13         Express warranty law also varies across the 50 states.  For example, Arizona, Florida, West

14   Virginia, Texas, and Oregon require privity, while Washington, Ohio, Illinois, and Texas do not.

15   *See Flory v. Silvercrest Indus. Inc.*, 633 P.2d 383, 387 (Ariz. 1981); *T.W.M. v. Am. Med. Sys.*, 886

16   F. Supp. 842, 844 (N.D. Fla. 1995); *McMahon v. Advance Stores Co., Inc.*, 705 S.E. 131, 141

17   (W.Va. 2010); *Texas Processed Plastics, Inc. v. Gray Enters., Inc.*, 592 S.W.2d 412, 415 (Tex.

18   App. 1979); *Colvin v. FMC Corp.*, 604 P.2d 157, 160 (1979); *Fortune View Condo. Ass'n v.*

19   *Fortune Star Dev. Co.*, 151 Wn.2d 534, 541 (Wash. 2004); *Reichhold Chem., Inc. v. Haas, No.*

20   *1983*, 1989 WL 133417, at *7 (Nov. 3, 1989); *Collins Co., Ltd. v. Carboline Co.*, 532 N.E.2d 834,

21   834 (Ill. 1988); *Basin Operating Co. v. Valley Steel Prods. Co.*, 620 S.W.2d 773, 777 (Tex. Civ.

22   App. 1981).

23         The reliance element of a claim for breach of express warranty also differs across the

24   states.  In California, there is a presumption of reliance that can be overcome.  *See* Cal. Com. Code

25   § 2313; *Weinstat v. Dentsply Intern., Inc.*, 180 Cal. App. 4th 1213 (2010); *Keith v. Buchanan*, 173

26   Cal. App. 3d 13, 21 (1985).  Minnesota, Kentucky, Oklahoma, New Hampshire, Florida,

27

28   _____
     [4] Darisse also seeks injunctive relief, but lacks standing for it.  *See supra* at 7.

United States District Court
Northern District of California

1   Mississippi, and Rhode Island law require a showing of actual reliance. *See Hendricks v.*

2   *Callahan*, 972 F.2d 190, 193 (8th Cir. 1992); *Overstreet v. Norden Labs., Inc.*, 669 F.2d 1286,

3   1289-91 (6th Cir. 1982); *Speed Fasteners, Inc. v. Newsom*, 382 F.2d 395, 397 (10th Cir. 1967);

4   *Hagenbuch v. Snap-On Tools Corp.*, 339 F. Supp. 676, 680 (D.N.H. 1972); *State Farm Ins. Co. v.*

5   *Nu Prime Roll-A-Way of Miami, Inc.*, 557 So. 2d 107, 108-09 (Fla. Dist. Ct. App. 1990); *Global*

6   *Truck & Equip. Co. v. Palmer Mach. Works, Inc.*, 628 F. Supp. 641, 651 (N.D. Miss. 1986)

7   (Mississippi law); *Thomas v. Amway Corp.*, 488 A.2d 716, 720 (R.I. 1985). Colorado and

8   Virginia do not require a showing of reliance, and New York and Washington do not require a

9   showing of reliance in certain circumstances. *See Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638,

10  644-45 (10th Cir. 1991) (Colorado law); *Daughtrey v. Ashe*, 413 S.E.2d 336, 338-39 (Va. 1992);

11  *CBS Inc. v. Ziff–Davis Pub. Co.*, 75 N.Y.2d 496, 503 (1990); *Baughn v. Honda Motor Co.*, 727

12  P.2d 655, 669 (Wash. 1986).

13          As for notice, in California, a plaintiff must provide pre-suit notice to the product

14  manufacturer within a reasonable time of discovering the breach of express warranty, except in

15  cases where the consumer did not purchase directly from the manufacturer. *See* Cal. Com. Code §

16  2607(3)(A); *Minkler v. Apple, Inc.*, 65 F. Supp. 3d 810, 817-18 (N.D. Cal. 2014); *Stearns v. Select*

17  *Comfort Retail Corp.*, 763 F. Supp. 2d 1128, 1142-43 (N.D. Cal. 2010) (requiring notice to

18  manufacturer, except where consumer did not purchase product from manufacturer directly).

19  Arkansas, North Carolina, Texas, and Wyoming generally require notice to the manufacturer,

20  while North Carolina requires notice to the seller, and notice to the manufacturer may or may not

21  be required. *See Cotner v. Int'l Harvester Co.*, 545 S.W.2d 627, 630 (Ark. 1977); *Maybank v. S.S.*

22  *Kresge Co.*, 302 N.C. 129, 133 (1981); *Halprin v. Ford Motor Co.*, 107 N.C. App. 423 (1992);

23  *U.S. Tire-Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 199 (Tex. App. 2003); *W. Equip. Co. v.*

24  *Sheridan Iron Works, Inc.*, 605 P.2d 806, 810-11 (Wyo. 1980); *Halprin v. Ford Motor Co.*, 420

25  S.E.2d 686, 688-89 (N.C. App. 1992). In New York, the sufficiency of notice is a jury question.

26  *See Hubbard v. General Motors*, 1996 WL 274018, at *4 (S.D.N.Y. 1996). In the District of

27  Columbia, Massachusetts, and Oregon, a plaintiff's delay in providing notice may bar suit, while

28  in Florida, North Carolina, and South Dakota, it does not. *See Mariner Water Renaturalizer, Inc.*

1   *v. Aqua Purification Sys., Inc.*, 665 F.2d 1066, 1069 (D.C. Cir. 1981); *P & F Constr. Corp. v.*

2   *Friend Lumber Corp.*, 575 N.E.2d 61, 64 (Mass. App. Ct. 1991); *Wagner Tractor, Inc. v. Shields*,

3   381 F.2d 441, 445 (9th Cir. 1967) (Oregon law); *Lafayette Stabilizer Repair, Inc. v. Mach.*

4   *Wholesalers Corp.*, 750 F.2d 1290, 1294 (5th Cir. 1985) (Florida law); *Maybank v. S.S. Kresge*

5   *Co.*, 273 S.E.2d 681, 685 (N.C. 1981); *Opp v. Nieuwsma*, 458 N.W.2d 352, 356-57 (S.D. 1990).

6          Like the differences in the states' consumer protection statutes, the differences in the

7   states' express warranty law is material.  To choose just one example, Nest would be allowed to

8   use a delay in providing notice as a defense in the District of Columbia, Massachusetts, and

9   Oregon, but not in Florida, North Carolina, and South Dakota.  The differences in other aspects of

10  express warranty law described above present similar clashes.

11                          **c.  Implied Warranties**

12         The fifty states' laws on the implied warranties of merchantability and fitness for a

13  particular purpose have significant differences regarding privity, notice, the availability of class

14  actions, and the definition of merchantability.  Alaska, Colorado, Louisiana, Michigan, Nebraska,

15  New Jersey, Pennsylvania, and Texas do not require privity, while Alabama, Arizona,

16  Connecticut, Florida, Idaho, Illinois, Iowa, Kentucky, New York, North Carolina, Ohio, Oregon,

17  Tennessee, Vermont, and Wisconsin do.  *See Morrow v. New Moon Homes, Inc.*, 548 P.2d 279,

18  289 (Alaska 1976); *Hansen v. Mercy Hospital, Denver*, 40 Colo. App. 17, 18 (1977); Colo. Rev.

19  Stat. Ann. § 4-2-318; *Media Prod. Consultants, Inc. v. Mercedes-Benz of N.A., Inc.*, 262 La. 80

20  (1972); *Cova v. Harley Davidson Motor Co.*, 26 Mich.App. 602 (1970); *Peterson v. North Am.*

21  *Plant Breeders*, 218 Neb. 258 (1984); *Alloway v. Gen. Marine Indus., L.P.*, 695 A.2d 264 (N.J.

22  1997); *Powers v. Lycoming Engines*, 272 F.R.D. 414, 420 (E.D. Pa. 2011); *Kassab v. Central*

23  *Soya*, 432 Pa. 217 (1968); *Nobility Homes of Tex., Inc. v. Shivers*, 557 S.W.2d 77, 81 (Tex. 1977);

24  *Wellcraft Marine, Inc. v. Zarzour*, 577 So.2d 414, 419 (Ala. 1990); *Flory v. Silvercrest Indust.,*

25  *Inc.*, 129 Ariz. 574 (1981); *United Tech. Corp. v. Saren Engineering, Inc.*, No. X06CV-

26  020173135S, 2002 WL 31319598 (Conn. Super. Ct. Sept. 25, 2002); *Mesa v. BMW of N. Am.,*

27  *LLC*, 904 So.2d 450, 458 (Fla. Dist. Ct. App. 2005); *Am. W. Enters., Inc. v. CNH, LLC*, 155 Idaho

28  746 (2013); *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.*, 97 Idaho 348 (1975);

United States District Court
Northern District of California

United States District Court
Northern District of California

*Zaro v. Maserati N. Am., Inc.*, 2007 WL 4335431, at *2 (N.D. Ill. 2007); *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103 (Iowa 1995); *Kentucky. Berger v. Standard Oil Co.*, 126 Ky. 155 (1907); *Kolle v. Mainship Corp.*, 2006 WL 1085067, at *5 (E.D.N.Y. 2006); *Hole v. General Motors Corp.*, 83 A.D.2d 715 (1981); *Gregory v. Atrium Door & Window Co.*, 106 N.C. App. 142 (1992); *Terry v. Double Cola Bottling Co.*, 263 N.C. 1 (1964); *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 758 (N.D. Ohio 2010); *Dravo Equip. Co. v. German*, 73 Or. App. 165 (1985); *Gregg v. Y.A. Co.*, 2007 WL 1447895, at *7 (E.D. Tenn. 2007); *Messer Griesheim Indust., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457 (Tenn. Ct. App.2003); *Vermont Plastics, Inc. v. Brine, Inc.*, 824 F.Supp. 444 (D.Vt.1993); *Stoney v. Franklin*, 54 Va. Cir. 591 (2001); *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225●Wis.2d 305 (1999).

Notice requirements also vary: Arkansas, Maryland, and Texas require pre-suit notice, while Kansas does not require notice in cases such as this, where the buyer is a consumer. *See Adams v. Wacaster Oil Co., Inc.*, 98 S.W.3d 832, 835-36 (2003); *Lynx, Inc. v. Ordnance Prods., Inc.*, 327 A.2d 502, 514 (Md. 1974); *U.S. Tire-Tech, Inc. v. Boeran*, 110 S.W.3d 194, 201 (Tex. App.-Houston 2003); *McKay v. Novartis Pharm. Corp.*, 934 F. Supp. 2d 898, 915 (W.D. Tex. 2013); *Wichita v. U.S. Gypsum Co.*, 828 F.Supp. 851, 856-57 (D. Kan. 1993), *rev'd on other grounds*, 72 F.3d 1491 (10th Cir. 1996). In contrast, in Alaska, Arizona, Ohio, Pennsylvania, and Virginia, the filing of the complaint may suffice for notice. *See Shooshanian v. Wagner*, 672 P.2d 455, 462-63 and n. 6 (Alaska 1983); *Davidson v. Wee*, 93 Ariz. 191  (1963); *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 54 (1989); *Precision Towers, Inc. v. Nat-Com, Inc.*, No. 2143, 2002 WL 31247992, at *5 (Phila. Ct. Com. Sept. 23, 2002); *In re Ford E-350 Van Prods. Liab. Litig.*, No 03-cv-4558, 2010 WL 2813788, at *39-40 (D.N.J. July 9, 2010) (Pennsylvania law); *Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262, 270 (4th Cir. 1998); *Bd. of Directors of Bay Point Condo. Ass'n, Inc. v. RML Corp.*, 57 Va. Cir. 295 (2002).

Different states also define merchantability differently, for the implied warranty of merchantability. In California, a breach of the implied warranty of merchantability means "the product did not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406 (2003) (citing Cal. Com. Code § 2314(2)). Delaware

21

asks whether "the design has created a risk of harm which is so probable that an ordinarily prudent person, acting as a manufacturer, would pursue a different available design which would substantially lessen the probability of harm." *Nacci v. Volkswagen of Am., Inc.*, 325 A.2d 617, 620 (Del. Super. 1974). In Vermont, the implied warranty of merchantability "is primarily directed at the operative essentials of a product." *Tracy v. Vinton Motors, Inc.*, 130 Vt. 512, 516 (1972).

These differences in the law are material. For example, NLT purchasers residing in states with strict privity requirements normally would have to show that they purchased their NLTs directly from Nest, rather than from a separate retailer, as Darisse did. Certifying a nationwide class under California law would allow Alabama Arizona, Connecticut, Florida, Idaho, Illinois, Iowa, Kentucky, New York, North Carolina, Ohio, Oregon, Tennessee, Vermont, and Wisconsin NLT purchasers who did not buy directly from Nest to recover, even though they could not recover if their own states' laws were applied. The differences in state law regarding privity have led courts to deny class certification. *See Cole v. Gen. Motors Corp.*, 484 F.3d 717, 728 (5th Cir. 2007) (citing *Chin v. Chrysler Corp.*, 182 F.R.D. 448, 460 (D.N.J. 1998); *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 272 (D.D.C. 1990)).

### d. Common Law Fraud

Material variations also exist among the states' laws regarding common law fraud. One difference is in the reliance requirement. California requires justifiable reliance but permits an inference of reliance in class actions if the same misrepresentations actually were made to each class member. *See SimTel Communications v. Nat'l Broadcasting Co., Inc.*, 71 Cal. App. 4th 1066, 1081 (1999); *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830 (2009). In contrast, Delaware and Florida do not allow reliance to be inferred in class actions because reliance requires individual proof. *See Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1991); *Humana, Inc. v. Castillo*, 728 So.2d 261 (Fla. Dist. Ct. App. 1999). Meanwhile, Arizona, Iowa, Mississippi, Missouri, Montana, New York, Oklahoma, Virginia, and Wyoming require actual reliance. *See Taeger v. Catholic Family and Cmty. Servs.*, 995 P.2d 721, 730 (Ariz. Ct. App. 1999); *Kunkle Water & Elec Inc., v. City of Prescott*, 347 N.W.2d 648, 653 (Iowa 1984); *Gen.*

22

1   *Motors Acceptance Corp. v. Baymon*, 732 So.2d 262, 269-70 (Miss. 1999); *Misischia v. St. John's*

2   *Mercy Med. Ctr.*, 30 S.W.3d 848, 868 (Mo. App. 2000); *Wright v. Blevins*, 705 P.2d 113, 117

3   (Mont. 1985); *Otto Roth & Co., Inc. v. Gourmet Pasta, Inc.*, 715 N.Y.S.2d 78, 80 (N.Y. App. Div.

4   2000); *Whitson v. Oklahoma Farmers Union Mut. Ins. Co.*, 889 P.2d 285, 287 (Okla. 1995);

5   *Spence v. Griffin*, 372 S.E.2d 595, 598 (Va. 1988); *Johnson v. Soulis*, 542 P.2d 867, 872 (Wyo.

6   1975).

7           The burden of proof for fraud claims also differs: California's standard is a preponderance

8   of the evidence, but most states demand clear and convincing evidence.  *See, e.g., Liodas v.*

9   *Sahadi*, 19 Cal. 3d 278, 291(1977); *Mannington Wood Floors, Inc. v. Port Epes Transp., Inc.*, 669

10  So.2d 817, 824 (Ala. 1995); *Enyart v. Transamerica Ins. Co.*, 985 P.2d 556, 562 (Ariz. Ct. App.

11  1999); *Park v. Sandwich Chef, Inc.*, 651 A.2d 798, 802, n.3 (D.C. App. 1994); *Shoppe v. Gucci*

12  *Am., Inc.*, 14 P.3d 1049, 1067 (Haw. 2000); *Sowards v. Rathbun*, 8 P.3d 1245, 1249 (Idaho 2000);

13  *Europlast, Ltd. v. Oak Switch Sys. Inc.*, 10 F.3d 1266, 1272 (7th Cir. 1993); *Alexander v. Everhart*,

14  7 P.3d 1282, 1289 (Kan. Ct. App. 2000); *Alvey v. Union Inv., Inc.*, 697 S.W.2d 145, 147 (Ky. Ct.

15  App. 1985); *Gross v. Sussex Inc.*, 630 A.2d 1156, 1161 (Md. 1993); *Singing River Mall Co. v.*

16  *Mark Fields, Inc.*, 599 So. 2d 938, 945 (Miss. 1992); *Snow v. Am. Morgan Horse Ass'n, Inc.*, 686

17  A.2d 1168, 1170 (N.H. 1996); *Eckhardt v. Charter Hosp. of Albuquerque, Inc.*, 953 P.2d 722, 735

18  (N.M. Ct. App. 1997); *Daibo v. Kirsch*, 720 A.2d 994, 999 (N.J. Super. App. Div. 1998); *Otto*

19  *Roth & Co., Inc. v. Gourmet Pasta, Inc.*, 715 N.Y.S.2d 78, 80 (N.Y. App. Div. 2000); *Kary v.*

20  *Prudential Ins. Co. of Am.*, 541 N.W.2d 703, 705 (N.D. 1996); *Gallant v. Bd. of Med. Exam'rs*,

21  974 P.2d 814, 818 (Or. Ct. App. 1999); *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1046 (Utah

22  App. 1994); *Hardwick-Morrison Co. v. Albertsson*, 605 A.2d 529, 531 (Vt. 1992); *Breault v.*

23  *Berkshire Life Ins. Co.*, 821 F. Supp. 410, 417 (E.D. Va. 1993); *Wharf v. Burlington N.R.R. Co.*,

24  60 F.3d 631, 637 (9th Cir. 1995); *Bender v. Phillips*, 8 P.3d 1074, 1078 (Wyo. 2000).

25          Finally, in California, the statute of limitations is three years, while it is one year in

26  Louisiana and two in Alabama, Kansas, Montana, Oklahoma, Oregon, and Pennsylvania.  *See* Cal.

27  Civ. Proc. Code § 338(d); *Winn Fuel Serv., Inc. v. Booth*, 34 So.3d 515, 519 (La. Ct. App. 2010);

28  *Jarzen v. Wright*, 679 So.2d 1086, 1088 (Ala. Civ. App. 1996); Ala. Code § 6-2-38; *Richards v.*

United States District Court
Northern District of California

United States District Court
Northern District of California

1   *Bryan*, 879 P.2d 638, 646 (Kan. Ct. App. 1994); *Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435,

2   440 (Mont. 2003); *Bennett v. McKibben*, 915 P.2d 400 (Okla. Civ. App. 1996); *Murray v. Lamb*,

3   148 P.2d 797, 801 (Or. 1944); 42 Pa. Cons. Stat. Ann. § 5524.

4        All of these differences are material. Darisse's proposed class would not be certified in

5   several states, because those states require individual class members to show reliance. Many

6   states also require a higher burden of proof than California does. Furthermore, applying California

7   law would allow class members in Louisiana, Alabama, Kansas, Montana, Oklahoma, Oregon,

8   and Pennsylvania to recover for claims that would be barred by the statute of limitations in their

9   home states.

10        **2.   Interests of Foreign Jurisdictions**

11        There are material differences in the 50 states' laws on each of Darisse's causes of action,

12   and so the next step is to examine each state's interest in the application of its own law under the

13   circumstances of this case to determine whether there is a true conflict. *Mazza*, 666 F.3d at 590.

14   To some extent, the Court covered this issue above, when discussing how the differences in the

15   states' laws set up conflicts over what period of claims are recoverable, what proof is required,

16   what the elements of the claims are, and even whether these claims can be brought as a class

17   action at all in certain states. But beyond that, the consumer protection, warranty, and fraud laws

18   of every state are important. The law reflects each state's reasoned judgment as to what conduct is

19   permitted or prohibited in that state. *See Mazza*, 666 F.3d at 591; *see also State Farm Mut. Auto.*

20   *Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). Each state carefully balances its duty to protect its

21   consumers from injuries caused by businesses doing business within the state with its duty to

22   shield those businesses from what the state may consider excessive regulation or litigation. *See*

23   *Mazza*, 666 F.3d at 591 ("Each state has an interest in setting the appropriate level of liability for

24   companies conducting business within its territory."). This case implicates each state's interest.

25   The proposed nationwide class consists of members from 50 states, and Darisse alleges that

26   consumers from each of those states were misled into buying and using the NLT in their state. *See*

27   Consolidated Compl. ¶¶ 12, 21, 61, 88, ECF 28. Nest denies that its advertising for the NLT was

28   misleading in any of those states. *See* Opp. at 2-4, ECF 111-11. Given the parties' positions, all

50 states have an interest in having their own laws applied to the consumer transactions that took place within their borders, and those laws have significant conflicts.

### 3. Which State's Interest is Most Impaired

Because the Court has found that there is a true conflict among the states' laws applicable to this case, the Court must evaluate the nature and strength of each state's interest in the application of its own law to determine whether that interest would be more impaired if its policy were subordinated to California's policy. *See Mazza*, 666 F.3d at 590. The Court must then apply the law of the state or states whose interest would be more impaired if its laws were not applied. *See id.* The Court is not permitted to weigh the conflicting state interests to determine which conflicting state law manifests the "better" or "worthier" social policy. *Id.* at 593 (citing *McCann*, 48 Cal.4th at 97). Instead, the Court must recognize the importance of federalism and every state's right to protect its consumers and promote those businesses within its borders. *See* Mazza at 593.

California has a significant interest in applying its laws to the consumer transactions that took place within its borders. Nest is headquartered in California and has its principal place of business a mere half hour from this courthouse. *See* Consolidated Compl. ¶ 11, ECF 28. Nest's marketing, sales, and engineering departments are located at the California headquarters. *See* Brinks Dep. at 85:3-86:1, Pl.'s Ex. 102, ECF 88-27. Some members of the proposed class presumably reside in California, since the NLT is sold nationwide.

But California's interest in applying its laws to residents of other states who purchased and used the NLT in those other states is much more attenuated. *See Edgar v. MITE Corp.*, 457 U.S. 624, 644 (1982). Indeed, California law states that "with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest." *Hernandez v. Burger*, 102 Cal. App. 3d 795, 802 (1980). California considers the geographic location of the omission or where the misrepresentations were communicated to the consumer as the place of the wrong. *See McCann*, 48 Cal.4th at 94 n. 12. For the out-of-state NLT buyers, the place of the wrong is not California, but the state where each NLT buyer saw Nest's advertising, relied on it, and bought the NLT. *See Mazza*, 666 F.3d at 593-94 (finding "the last events necessary for liability as to the

foreign class members—communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles—took place in the various foreign states, not in California"). And those states have a compelling interest in protecting their consumers from in-state injuries caused by an out-of-state company doing business within their borders, and in setting the scope of recovery for consumers under their own laws. The Court thus concludes that every state would be impaired in its ability to protect consumers within its borders if California law were applied to all claims of the nationwide class. Each class member's claims instead must be governed by the laws of the state in which the transaction took place.

Because the laws of 50 states must be applied in this case, common questions of law do not predominate over the questions affecting individual class members as required by Rule 23(b)(3). The claims of class members in California raise significantly different legal issues from the claims of members from other states, and those claims also are significantly different from state to state. Certification of the entire nationwide class under California law thus is improper—predominance requires common questions of law to predominate over questions affecting individual members, and this case requires applying the laws of fifty states.

**V.      ORDER**

Darisse has not satisfied Rule 23(a) or 23(b)(3). His motion for class certification is DENIED.

**IT IS SO ORDERED.**

Dated: August 15, 2016

BETH LABSON FREEMAN
United States District Judge